706 A.2d 180

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. THEODORE DICKEY, DEFENDANT–APPELLANT.

Argued October 21, 1997—Decided March 4, 1998.

470

*Jacqueline E. Turner*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney).

*Annmarie Cozzi*, Assistant Prosecutor, argued the cause for respondent (*William H. Schmidt*, Bergen County Prosecutor, attorney).

*Daniel I. Bornstein*, Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Peter Verniero*, Attorney General, attorney).

The opinion of the court was delivered by

O'HERN, J.

The question in this appeal is whether the investigative detention of motorists following a traffic stop was sufficiently limited in scope and duration to remain within the bounds authorized by *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968) and *United States v. Sharpe*, 470 *U.S.* 675, 105 *S.Ct.* 1568, 84 *L.Ed.*2d

605 (1985). We find, in the circumstances of this case, that the duration of the detention and the degree of intrusion upon Fourth Amendment interests exceeded permitted bounds. The evidence that resulted from the illegal detention is inadmissible in the defendant's criminal trial. *United States v. Ramos*, 42 *F*.3d 1160, 1164 (8th Cir.1994), *cert. denied*, 514 *U.S.* 1134, 115 *S.Ct.* 2015, 131 *L.Ed.*2d 1013 (1995).

I

At 10:36 p.m. on February 12, 1994, defendant, Theodore Dickey, was a passenger in a car driven by Dion Parker on I–95, the connection between the New Jersey Turnpike and the George Washington Bridge.[1] Parker was driving thirty-four miles per hour in a fifty-five mile-per-hour zone. His car was in the middle lane, causing other cars to pass him in the right lane.

A New Jersey State Police officer pulled the car over. The trooper approached the driver's side window and requested that Parker produce his license, insurance card, and registration. Parker turned over his license but did not produce any registration or proof of insurance. According to the trooper, Parker seemed very nervous. His eyes were bloodshot, and his hands were trembling. Parker told the trooper that the vehicle belonged to a friend named "Leon" but could not furnish Leon's last name or address. Parker gave the officer only a vague description of where he was coming from.

The trooper then asked Dickey to exit the car. Dickey appeared "extremely agitated" and paced about at the rear of the

---

[1] Because the trial court focused on the duration of the detention to the exclusion of the degree of intrusion, it did not make specific findings on certain disputed factual issues such as whether the motorists were handcuffed at the State Police barracks and whether and when they were told that they were free to leave the barracks. Rather than remand the matter for further factual findings, we will resolve the case on the basis of the facts set forth in the State's Appellate Division brief and those facts acknowledged to be true by the State's witnesses at the suppression hearing.

car. Dickey told the trooper that his cousin Leon owned the car but could not provide Leon's last name or address. He said that he (Dickey) and Parker were coming from Manhattan.

The trooper asked for consent to search the car. Both refused to sign the consent form. The trooper searched the passenger compartment for the registration or insurance card. Finding neither, the trooper asked the two to return to the State Police barracks. He explained that he had to verify the ownership of the car. They assented, were informed of their *Miranda* rights, handcuffed, and placed in the rear of the trooper's car. (It is State Police practice that when there is no partition between the front and rear of the car, troopers handcuff any rear-seat passengers.) After giving *Miranda* warnings to the pair, the trooper asked Parker why he was so nervous. Parker replied, "Nothing is in the ride. I'm not nervous." The trooper then asked why he told him nothing was in the car, and Parker stated that nothing was in the trunk.

Thinking that there might be drugs present because of Parker's reference to the trunk, the trooper called a "K–9 unit" to have a narcotics detection dog brought to the barracks. The car was towed from the highway and arrived at the barracks close to midnight.

At the barracks, the trooper informed defendant and Parker that they were not free to leave until he had finished his investigation. A computer inquiry on the license plates did not disclose any report that the car was stolen, but the trooper did discover that the car was registered to Leon McCullum, residing at an address in Cincinnati, Ohio. He was unable to obtain McCullum's phone number.

Sometime between one and two in the morning, the K–9 Unit's reaction signalled the presence of narcotics in the trunk of the car. At 2:45 a.m., Dickey signed a consent form to permit a search of the trunk. The trooper discovered approximately two kilograms of cocaine in the trunk.

Parker and Dickey were charged with first-degree possession of cocaine with intent to distribute and third-degree possession of cocaine. Before trial, defendant moved to suppress the cocaine found in the trunk. The trial court denied the motion.

> [T]he [trial] judge concluded: (i) the stop was proper, based on the officer's observation that the car was traveling at a slow rate of speed; (ii) the search of the interior compartment of the car was reasonable, since the defendant had not produced any form of registration for the vehicle; (iii) the movement of the vehicle and its occupants to the police barracks was reasonable, as it enabled the officers to ascertain the owner of the car and to determine whether defendant or codefendant was authorized to operate it; and (iv) the sniff was not a search, and the dog's alert gave the police probable cause to search the car; thus the subsequent consent given by defendant was valid.
>
> [*State v. Dickey*, 294 *N.J.Super.* 619, 624–25, 684 *A.*2d 92 (App.Div.1996).]

Reserving the right to appeal the suppression ruling, Dickey pled guilty to the first count. The court sentenced Dickey to seven years' imprisonment with a two-and-one-half-year period of parole ineligibility.

The Appellate Division noted that the sole issue before it was whether the two-and-one-half- to three-and-one-half-hour detention between the initial stop and the establishment of probable cause was reasonable. *Id.* at 625–26, 684 *A.*2d 92. Defendant conceded, and the panel agreed, that the trooper was justified in pulling over Dickey and his codefendant. *Id.* at 625, 684 *A.*2d 92. In addition, the trooper was justified in detaining the car and the two individuals because the facts of the case supported a finding of reasonable suspicion. *Ibid.*

> From the totality of the circumstances, it is clear that the troopers had reasonable suspicion that the driver and defendant had no right to the car and that something was amiss concerning the contents of the trunk. The troopers properly continued their attempt to find the owner, to ascertain the driver's and defendant's authority to possess the vehicle, and to bring the drug-sniffing dog to the station to determine whether drugs were present in the trunk.
>
> [*Id.* at 635, 684 *A.*2d 92.]

The court observed that the trooper had a duty to investigate the ownership of the car, whether defendant was authorized to use the car, and whether the car contained contraband. *Id.* at 634, 684 *A.*2d 92. Because the trooper diligently pursued the investigation, the duration of the detention did not infringe on defendant's

constitutional rights. *Id.* at 635, 684 *A.*2d 92. Even if the detention did rise to the level of an improper arrest, that conclusion was not decisive. Defendant's arrest did not yield any evidence against defendant; it was the detention of the car that yielded the evidence. Thus, an arrest, if illegal, would not bar defendant's prosecution. *Id.* at 632, 684 *A.*2d 92.

We granted defendant's petition for certification. 148 *N.J.* 463, 690 *A.*2d 610 (1997).

## II

### A.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const.* amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States,* 517 *U.S.* 806, 809–10, 116 *S.Ct.* 1769, 1772, 135 *L.Ed.*2d 89, 95 (1996) (citing *Delaware v. Prouse,* 440 *U.S.* 648, 653, 99 *S.Ct.* 1391, 1396, 59 *L.Ed.*2d 660, 667 (1979); *United States v. Martinez–Fuerte,* 428 *U.S.* 543, 556, 96 *S.Ct.* 3074, 3082, 49 *L.Ed.*2d 1116, 1127 (1976); *United States v. Brignoni–Ponce,* 422 *U.S.* 873, 878, 95 *S.Ct.* 2574, 2578, 45 *L.Ed.*2d 607, 614 (1975)). An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" as that concept is defined under Fourth Amendment law. *Prouse, supra,* 440 *U.S.* at 663, 99 *S.Ct.* at 1401, 59 *L.Ed.*2d at 673. As a general rule, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren, supra,* 517 *U.S.* at 810, 116 *S.Ct.* at 1772, 135 *L.Ed.*2d at 95–96; *see Prouse, supra,* 440 *U.S.* at 659, 99 *S.Ct.* at 1399, 59 *L.Ed.*2d at 671; *Pennsylvania v. Mimms,* 434 *U.S.* 106, 109, 98 *S.Ct.* 330, 332, 54 *L.Ed.*2d 331, 336 (1977) (*per curiam* ).

■ The *Terry* Court created a two-part test designed to measure the reasonableness of an investigative stop against the intrusion on the detainee's right to be secure from unreasonable searches. Under this test, we must consider

whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

[*Terry, supra*, 392 *U.S.* at 20, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905.]

Courts employ this *Terry* standard to measure the reasonableness of a detention following a valid traffic stop. *See United States v. Barahona*, 990 *F.*2d 412, 416 (8th Cir.1993) (applying *Terry* standards for reasonableness of detention following lawful stop to probable cause stop for traffic violation); *United States v. Cummins*, 920 *F.*2d 498, 500 (8th Cir.1990) (same), *cert. denied*, 502 *U.S.* 962, 112 *S.Ct.* 428, 116 *L.Ed.*2d 448–49 (1991).

Defendant accepts that the State Trooper had probable cause to believe that provisions of the motor vehicle code had been violated. Defendant concedes that the initial stop was lawful. Defendant's sole argument is that the period of the detention after the traffic stop and prior to the police obtaining probable cause was excessive and constituted an illegal detention. Thus, the sole question posed by defendant's extended detention prior to the search of the trunk of the car is whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, supra*, 392 *U.S.* at 20, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905.

### B.

■ "[T]here is [no] litmus-paper test for ... determining when a seizure exceeds the bounds of an investigative stop." *Florida v. Royer*, 460 *U.S.* 491, 506, 103 *S.Ct.* 1319, 1329, 75 *L.Ed.*2d 229, 242 (1983) (plurality opinion). The Supreme Court has refused to adopt a "hard-and-fast time limit for a permissible *Terry* stop." *Sharpe, supra*, 470 *U.S.* at 686, 105 *S.Ct.* at 1575, 84 *L.Ed.*2d at 615; *accord United States v. Place*, 462 *U.S.* 696, 709 n. 10, 103 *S.Ct.* 2637, 2646 n. 10, 77 *L.Ed.*2d 110, 122 n. 10 (1983). "Much as

a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe, supra,* 470 *U.S.* at 685, 105 *S.Ct.* at 1575, 84 *L.Ed.*2d at 615.

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.
>
> [*Id.* at 686, 105 *S.Ct.* at 1575, 84 *L.Ed.*2d at 615–16.]

■ Although we focus on the duration of this stop, "common sense and ordinary human experience" require that we take notice of both prongs of the *Terry* analysis. *Terry* recognized a "narrowly drawn" exception to the probable-cause requirement of the Fourth Amendment for certain seizures of the person that do not rise to the level of full arrests. *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909. The Court found that such an intrusion was permissible for two primary reasons. First, a *Terry* stop—brief and narrowly circumscribed—was said to involve a "wholly different kind of intrusion upon individual freedom" than a traditional arrest. *Id.* at 26, 88 *S.Ct.* at 1882, 20 *L.Ed.*2d at 909. Second, under such circumstances, the government's interest in preventing imminent criminal activity may be substantial enough to outweigh the still-serious privacy interests implicated by a limited *Terry* stop. *Id.* at 22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906–07. Thus, when the intrusion on the individual is minimal, and when law enforcement interests outweigh the privacy interests infringed in a *Terry* encounter, a stop based on objectively reasonable and articulable suspicions, rather than upon probable cause, is consistent with the Fourth Amendment. *Id.* at 20–21, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905.

In *Dunaway v. New York,* 442 *U.S.* 200, 210, 99 *S.Ct.* 2248, 2255, 60 *L.Ed.*2d 824, 834 (1979), the Court elaborated on the two *Terry* principles:

> First, [*Terry*] defined a special category of Fourth Amendment "seizures" so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable could be replaced by a

balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause. . . .

Thus, in *Place, supra,* 462 *U.S.* at 703, 103 *S.Ct.* at 2642, 77 *L. Ed.*2d at 118 (involving the detention of an air traveler's luggage suspected to contain drugs), the Court held: "When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause." Refusing to rely on a rigid test, the Court recognized that "[t]he context of a particular law enforcement practice, of course, may affect the determination whether a brief intrusion on Fourth Amendment interests on less than probable cause is essential to effective criminal investigation." *Id.* at 704, 103 *S.Ct.* at 2643, 77 *L.Ed.*2d at 119.

Even a stop that lasts no longer than necessary to complete the investigation for which the stop was made may amount to an illegal arrest if the stop is more than "minimally intrusive." In the absence of probable cause, the stop must first be found not unduly intrusive before any balancing of the government's interest against the individual's interest becomes appropriate. *See id.* at 703, 103 *S.Ct.* at 2642, 77 *L.Ed.*2d at 118. A detention that is the functional equivalent of an arrest must be supported by probable cause regardless of its duration. *See United States v. Miller,* 974 *F.*2d 953, 956 (8th Cir.1992) (finding that an arrest must be supported by probable cause) (citing *Terry, supra,* 392 *U.S.* at 25–31, 88 *S.Ct.* at 1882–85, 20 *L.Ed.*2d at 908–11).

Simply stated, an investigative stop becomes a *de facto* arrest when " 'the officers' conduct is more intrusive than necessary for an investigative stop.' " *United States v. Jones,* 759 *F.*2d 633, 636 (8th Cir.) (quoting *United States v. Rose,* 731 *F.*2d 1337, 1342 (8th Cir.), *cert. denied,* 469 *U.S.* 931, 105 *S.Ct.* 326, 83 *L. Ed.*2d 263 (1984)), *cert. denied,* 474 *U.S.* 837, 106 *S.Ct.* 113, 88 *L. Ed.*2d 92 (1985). Although there are no "bright line" tests to

guide us, courts have identified several factors to aid in the analysis.

Time is an important factor in distinguishing between an investigative stop and a *de facto* arrest: There is "no rigid time limitation on *Terry* stops," *United States v. Sharpe*, 470 *U.S.* 675, 685, 105 *S.Ct.* 1568, 1575, 84 *L.Ed.*2d 605 [, 615] (1985), but a stop may be too long if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers," *id.* at 687, 105 *S.Ct.* at 1576 [, 84 *L.Ed.*2d at 616]. Another factor is "the degree of fear and humiliation that the police conduct engenders." *United States v. Lego*, 855 *F.*2d 542, 544–45 (8th Cir.1988) (citation omitted). The courts have also held that transporting a suspect to another location or isolating him from others can create an arrest. *See [United States v.] Rose*, 731 *F.*2d [1337,] 1342 [ (8th Cir.), *cert. denied*, 469 *U.S.* 931, 105 *S.Ct.* 326, 83 *L.Ed.*2d 263 (1984) ]. Additional factors that may weigh in favor of an arrest are subjecting a suspect to unnecessary delays, handcuffing him, or confining him in a police car. *See [United States v.] Willis*, 967 *F.*2d [1220], 1224 [ (8th Cir.1992) ].

[*United States v. Bloomfield*, 40 *F.*3d 910, 917 (8th Cir.1994), *cert. denied*, 514 *U.S.* 1113, 115 *S.Ct.* 1970, 131 *L.Ed.*2d 859 (1995).]

## III

Applying these principles to the circumstances of this case leads us to conclude that the combination of the duration of the detention and the degree of intrusion upon the liberty of the motorists exceeded that measure authorized by *Terry* and its progeny.

## A.

Was the "detention too long in duration"? *Sharpe, supra*, 470 *U.S.* at 686, 105 *S.Ct.* at 1575, 84 *L.Ed.*2d at 615.

Defendant does not dispute that the initial traffic stop was valid. *Whren, supra*, expressly authorizes a traffic stop based on probable cause to believe that a driver is violating an applicable motor vehicle law. 517 *U.S.* at 808, 116 *S.Ct.* at 1772, 135 *L. Ed.*2d at 95–96. "The foremost method of enforcing traffic and vehicle safety regulations ... is acting upon observed violations." *Prouse, supra*, 440 *U.S.* at 659, 99 *S.Ct.* at 1399, 59 *L.Ed.*2d at 671. Of course, the reasonableness of the detention is not limited to investigating the circumstances of the traffic stop. If, during the course of the stop or as a result of the reasonable inquiries

initiated by the officer, the circumstances "give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions." *United States v. Johnson,* 58 *F.*3d 356, 357–58 (8th Cir.) (quoting *Barahona, supra,* 990 *F.*2d at 416), *cert. denied,* 516 *U.S.* 936, 116 *S.Ct.* 348, 133 *L.Ed.*2d 245 (1995); *see Ramos, supra,* 42 *F.*3d at 1163 (holding that inconsistent answers by occupants or problems with the occupants' licenses or registration of the vehicle provide grounds for broadening the inquiry); *United States v. White,* 42 *F.*3d 457, 460 (8th Cir.1994) (holding that reasonable suspicion that there is contraband in the vehicle justifies "greater intrusion unrelated to the traffic stop"); *Barahona, supra,* 990 *F.*2d at 416 (holding that for detention to be reasonable, officer's questions must relate to purpose of stop, but "if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions").

The failure of Dickey and his codefendant to provide the registration of the vehicle plainly provided grounds for broadening the investigation. When Dickey and his companion were unable to furnish the last name of the owner, those suspicions were naturally heightened. It may appear counterintuitive that one not know the last name of an uncle or cousin. In larger extended families, it may not be unusual to know family members by more familiar names than their surnames. Still, the officer cannot be faulted for reacting as he did.

The trooper's natural suspicions would have been eased somewhat when the license lookup recorded that the car was, indeed, owned by Leon McCullum of Cincinnati, Ohio, and his National Crime Information Center (NCIC) search showed that there was no report that the vehicle had been stolen. But because the theft may have been recent, and thus not reported to the NCIC, the trooper sought to contact, through precinct officers in Cincinnati, the owner of the car. Given that the owner was not immediately

found, it was at least reasonable to pursue this investigation for a period of time.

Permitting the continued detention of the motorists on the ground that the trooper was locating the owner of the vehicle presents the possibility that the trooper would be justified in continuing the investigation indefinitely. For example, if the owner of the vehicle had gone away for a weekend, would it be reasonable to detain the car for the rest of the weekend while waiting for the owner to return? The trooper's inquiry into the ownership of the car did not quickly dispel his suspicion that the car had been stolen; on the other hand, the investigation did not increase his suspicion.

What, then, are the outer limits of duration of a detention? In *Sharpe, supra,* the Court found that a twenty-minute detention was reasonable when the police acted diligently and defendant contributed to the delay. 470 *U.S.* at 686–88, 105 *S.Ct.* at 1575–77, 84 *L.Ed.*2d at 615–17. In *Place, supra,* the Court found that a ninety-minute detention of defendant's luggage was unreasonable when agents did not act diligently to minimize the delay. 462 *U.S.* at 709–10, 103 *S.Ct.* at 2645–46, 77 *L. Ed.*2d at 122–23.

*Limonja v. Commonwealth,* 8 *Va.App.* 532, 383 *S.E.*2d 476, 482 (1989), *cert. denied,* 495 *U.S.* 905, 110 *S.Ct.* 1925, 109 *L.Ed.*2d 288 (1990), provides several instances in which extended detention has been upheld:

> Using the foregoing [*Terry/Sharpe* ] test, courts have upheld detention of forty-five minutes, *United States v. Davies,* 768 *F.*2d 893, 901 (7th Cir.), *cert. denied,* 474 *U.S.* 1008, 106 *S.Ct.* 533, 88 *L.Ed.*2d 464 (1985); fifty minutes, *United States v. Alpert,* 816 *F.*2d 958, 964 (4th Cir.1987); sixty minutes, *United States v. Large,* 729 *F.*2d 636, 639 (8th Cir.1984); *United States v. Campbell,* 627 *F.Supp.* 320, 325–26 (D.Alaska 1985), *aff'd* 810 *F.*2d 206 (9th Cir.1987); and seventy-five minutes, *United States v. Borys,* 766 *F.*2d 304, 313 (7th Cir.1985), *cert. denied,* 474 *U.S.* 1082, 106 *S.Ct.* 852, 88 *L.Ed.*2d 893 (1986). Each of the last four cited cases involved delays necessitated by efforts to obtain a narcotics dog for sniffing luggage or packages, as in this case.

Conversely, *Garza v. Lett,* No. 87C 4877, 1988 WL 84742, at 3 (N.D.Ill. Aug.10, 1988), provides instances when longer detention has not been upheld:

> [O]nce a detention stretches into hours it no longer can be considered an investigatory *Terry* stop. *See United States v. Perez–Esparza*, 609 *F*.2d 1284 (9th Cir.1979) (three-hours); *United States v. Tucker*, 610 *F*.2d 1007 (2d Cir.1979) ("several" hours). We have found no case upholding a two-hour *Terry* stop. We conclude that the detention of plaintiffs, which lasted over two hours, plainly went beyond the "brief" time limit of a *Terry* stop.

"Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Sharpe, supra*, 470 *U.S.* at 685, 105 *S.Ct.* at 1575, 84 *L.Ed.*2d at 615. As the duration of the investigation and corresponding stop becomes longer, a court is less likely to find the infringement on the detainee's rights permissible under the *Terry* analysis. This is not to say that a stop over two hours can never be permissible, but any detention of that duration must be justified by the circumstances.

## B.

Was the nature of the detention "minimally intrusive of the individual's Fourth Amendment interests"? *Place, supra*, 462 *U.S.* at 703, 103 *S.Ct.* at 2642, 77 *L. Ed.*2d at 118.

The degree of intrusion upon the liberty of the motorists was obviously more than that involved in *Terry*. In *Terry* there was a brief street encounter. In this case the motorists were removed from the place of the original detention, handcuffed as they were transported in a police car, albeit voluntarily, to the police station, handcuffed at times in the stationhouse, and told that they were not free to leave. In many circumstances when probable cause justifies the stop of an automobile, the police will also have probable cause to arrest the occupants before searching a car. Once arrested, suspects may be taken to the stationhouse for booking. In such circumstances, seizing the automobile by securing it on the spot or taking it to the stationhouse would not represent a serious intrusion upon the occupant's possessory interest in the car. The occupant under arrest is not free to use the car. In this case, the converse occurred.

That suspects have been removed to an office or to a police station are factors that the Supreme Court and other courts have found significant in distinguishing *Terry* stops from custodial

arrests. *See Royer, supra,* 460 *U.S.* at 502–03, 103 *S.Ct.* at 1327, 75 *L.Ed.*2d at 239–40; *Dunaway, supra,* 442 *U.S.* at 212, 99 *S.Ct.* at 2256, 60 *L.Ed.*2d at 835–36; *United States v. Espinosa–Guerra,* 805 *F.*2d at 1502, 1509 (11th Cir.1986); *see United States v. Berry,* 670 *F.*2d 583, 597 (5th Cir.1982) (*en banc*).

Although not establishing the fact of an arrest, *see United States v. Melendez–Garcia,* 28 *F.*3d 1046, 1052 (10th Cir.1994), the use of handcuffs heightened the degree of intrusion upon the liberty of the suspects. The degree of the intrusion on defendant's Fourth Amendment interests was at the outermost limit of an investigatory detention. Dickey and Parker were transported, in handcuffs, a substantial distance to the police station. At the station they were periodically in handcuffs and told that they could not leave until the investigation was completed. Although Dickey voluntarily accompanied the trooper to the station, he truly was left with no other option. The trooper would not have permitted Dickey to remain on the highway and did not offer any additional option that would have permitted Dickey and his companion to continue on to Ohio without the car.

## IV

Before concluding our analysis, we address the State's additional argument that although the detention of the individuals was not justified, the detention of the vehicle was justified and the drugs would have inevitably been discovered in the course of an inventory search of the vehicle.

The State contends that *N.J.S.A.* 39:5–47 permits the Division of Motor Vehicles to impound a vehicle in such circumstances. That statute reads, in relevant part:

The commissioner may authorize the seizure of a motor vehicle operated over the highways of this state when he has reason to believe that the motor vehicle has been stolen or is otherwise being operated under suspicious circumstances and may retain it in the name of the department until such time as the identity of ownership is established, whereupon he shall order the release of the motor vehicle to its owner.

An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable

items (such as might be kept in a towed car), and to protect against false claims of loss or damage. *See South Dakota v. Opperman*, 428 *U.S.* 364, 369, 96 *S.Ct.* 3092, 3097, 49 *L.Ed.*2d 1000, 1005 (1976); *State v. Slockbower*, 79 *N.J.* 1, 15, 397 *A.*2d 1050 (1979).

Although *N.J.S.A.* 39:5–47 authorizes the Commissioner of the Division of Motor Vehicles to impound a vehicle, the seizure of the vehicle (like every detention) is subject to constitutional limitations. For purposes of Fourth Amendment analysis, the statute provides justification for investigative detention, not a forfeiture of the vehicle, for a reasonable period of time when questions of ownership are involved. Because of the substantial value of automobiles today, we agree that police should have, pursuant to statutory authorization, a longer period of time to detain property in the form of an automobile than would be permitted under a traditional *Terry* analysis. In the circumstances of this case, however, the detention of the personal property was so intertwined with the detention of the persons as to effect a seizure of the person. Although the police officer did not place the motorists under arrest until after the contraband had been discovered, the suspects were not realistically free to leave in the early morning hours from an isolated State Police barracks. It is difficult to see exactly to where they were free to go. In this case, then, the intrusion on the Fourth Amendment interests of the person were intertwined with the detention of the property.

In *Place, supra,* Justice O'Connor observed that

[t]he premise of the Government's argument is that seizures of property are generally less intrusive than seizures of the person. While true in some circumstances, that premise is faulty on the facts we address in this case. The precise type of detention we confront here is seizure of personal luggage from the immediate possession of the suspect for the purpose of arranging exposure to a narcotics detection dog.[2] Particularly in the case of detention of luggage within

---

2 The Court had emphasized in *Terry, supra,* "the manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all." 392 *U.S.* at 28, 88 *S.Ct.* at 1883, 20 *L. Ed.*2d at 910.

the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of the custodial confinement or to the public indignity of being personally detained. Nevertheless, such seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return. Therefore, when the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detention of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause. Under this standard it is clear that the police conduct here exceeded the permissible limits of a *Terry*-type investigative stop.

[462 *U.S.* at 708–09, 103 *S.Ct.* at 2645, 77 *L.Ed.*2d at 121–22 (footnote omitted).]

Because detention of the automobile "effectively restrained the person" of the motorists, the limitations applicable to investigative detention of a person defined the permissible scope of the detention of the vehicle. In addition, unlike the traveler at the airport who can retrieve luggage later, these motorists were not even "technically still free to continue ... their travels." They were effectively confined to the police barracks, disrupting their travel plans.

Because the detention of the vehicle was interrelated with the detention of persons, the constitutional limits concerning the detention of the persons will control.

V

Taken separately, the duration and the detention of the motorists or their vehicle might have been permissible had the nature of the infringement on Fourth Amendment interests been "minimally intrusive." For example, had the motorists been permitted to remain free to continue on their travels by public transit or other means of transportation, or had they not been effectively confined to the stationhouse, the detention of the personal property might have been subject to a less stringent standard. The police knew the identities and whereabouts of Parker and Dickey and with access to computerized databases, such as the Computerized

Criminal History (CCH) database, could determine whether the suspects had a criminal history. Taken together, however, the duration of the detention and degree of the intrusion exceed *Terry/Sharpe* bounds. To our knowledge, no court has upheld so long and so intrusive an investigatory detention.

We recognize the needs of law enforcement for guidelines in this most important area of drug interdiction. Although there are no bright lines, police training methods can hone in on the two prongs of analysis required to sustain a *Terry/Sharpe* detention. Had the police had articulable suspicion that the vehicle contained drugs based on discovery of a small amount of drugs or the presence of drug paraphernalia, beepers or the like, a detention for sufficient time to bring the K–9 unit to the scene would not be unreasonable. *See Bloomfield, supra,* 40 *F.*3d at 918–19 (holding that totality of circumstances supported reasonable suspicion that defendant was transporting drugs, and, therefore, officer was justified in seizing truck).

This may be that rare case when the interests of society and the individual are no longer in conflict. The defendant has paid a debt to society. He acknowledged at sentencing that what he did was wrong, although an aberration in an otherwise blameless life. He has served the parole ineligibility term of his sentence.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—7.

*Opposed*—None.