743 So.2d 1145 (1999)
Israel MELENDEZ, Appellant,
v.
SHERIFF OF PALM BEACH COUNTY, Appellee.
No. 98-1869.
District Court of Appeal of Florida, Fourth District.
October 6, 1999.
*1146 Jeffrey F. Gordon and Justin Kam of Broad and Cassel, West Palm Beach, for appellant.
Fred H. Gelston of Fred H. Gelston, P.A., West Palm Beach, for appellee.
WARNER, C.J.
Appellant, Israel Melendez, appeals a final judgment entered in conformity with a jury verdict finding in favor of the appellee, the Sheriff of Palm Beach County, on a claim of false imprisonment and battery. In charging the jury during the trial, the court refused to give an instruction explaining that the Sheriff's deputy was required to have probable cause to continue detaining the appellant after a stop based upon a BOLO report of a shooting. Instead, the trial court instructed the jury on reasonable suspicion. Finding that the continued detention of the appellant under the facts of this case and the manner in which he was detained constituted a de facto arrest, we hold that it was error to fail to instruct the jury on probable cause.
On June 14, 1995, a shooting occurred at Lake Worth High School, and at 12:51 p.m. a BOLO was issued describing the suspect as a "Puerto Rican male, heavy set, shaved head, approximately eighteen years of age but adult in appearance; last seen wearing a white t-shirt with blue jeans; suspect is in the company of a black female." The suspect was last seen driving a white compact car, possibly a Honda Civic. Subsequently, at 2:54 p.m., a revised BOLO indicated that the Lake Worth Police Department had probable cause for a white male whose name was Alexander Kucer. He was not described *1147 as being Hispanic. The second BOLO also instructed that if Kucer was located, to hold him and notify Lake Worth, because they had a photo available.
Meanwhile, two sheriff's officers were having lunch at T.G.I. Friday's in Boynton Beach. Officer Moreno had received both BOLOs. At the restaurant, Moreno noticed Melendez's car in the parking lot and called to have the plates checked.
Melendez and his wife, Ingrid, had met for lunch at a T.G.I. Friday's. At lunch they talked about the shooting at the high school, which had been reported to Ingrid by her sister who had witnessed the incident.
After lunch, around 4:00 p.m., as they were leaving the parking lot, three police cars converged on their vehicle. An officer approached their car with a drawn gun. Ingrid was driving and immediately stopped the car. The officer with the gun approached her window, ordering her out of the car. Melendez exited the passenger side. Both were then placed in handcuffs. Ingrid observed one of the officers shove her husband, shoulder-first, up against the car and then yank his arm to handcuff him. The officers then proceeded to check their driver's licenses, pat them down and place each of them in a separate police car for half an hour. In addition, their car was searched. However, they were not told why they were being detained.
The sheriff's officers called the dispatcher to report that they had detained a Hispanic male and female. Officer Moreno conceded that numerous details of the BOLO, including the date of birth and the name, did not match up with appellant's driver's license, but he noted that he did not know whether the driver's license was a forgery. None of the officers on the scene testified that Melendez resisted at all and in fact conceded that he was very cooperative throughout the ordeal.
Officer Odum of the Lake Worth Police Department responded to the call from the restaurant after he completed his investigation at the high school. About three to five minutes following his arrival, Melendez and his wife were released from the handcuffs, after the officer determined that Melendez was not the person they were searching for. By coincidence it turned out that Melendez actually knew Kucer and gave the police directions to his home, which resulted in Kucer's apprehension.
The trial court instructed the jury that the officer's actions were justified if he had reasonable suspicion to detain Melendez. Melendez's counsel had offered an alternative instruction, arguing that the encounter was not an investigatory Terry[1] stop and frisk but was instead an arrest, requiring probable cause. The jury returned a verdict in favor of the Sheriff and Melendez appeals.
Determinations of probable cause and reasonable suspicion are entitled to a de novo review on appeal. See Ornelas v. United States, 517 U.S. 690, 691, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911 (1996); Saturnino-Boudet v. State, 682 So.2d 188, 192 n. 6 (Fla. 3d DCA 1996), rev. dismissed, 689 So.2d 1071 (Fla.1997). In this case, the facts are generally undisputed as to what occurred. The only question presented is whether the continued detention of Melendez required probable cause or mere reasonable suspicion.
Melendez has conceded that, based upon the BOLO, Officer Moreno had reasonable suspicion to stop his vehicle at the restaurant. We therefore do not address whether the facts were sufficient to find reasonable suspicion. Melendez also admits that it was reasonable for the officers to handcuff him because the crime involved the use of a firearm. He complains, however, that once the officers were assured that he was not armed and posed no risk, his continued detention in handcuffs amounted to an arrest which had to be supported by probable cause.
*1148 Terry, 392 U.S. at 22, 88 S.Ct. 1868 and section 901.151(2), Florida Statutes (1995), permit a police officer to temporarily detain a person who he or she believes has committed or is committing a crime "for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding his presence abroad which led the officer to believe that he had committed ... a criminal offense." This detention may not last "longer than is reasonably necessary to effect the purposes of [section (2) ]". § 901.151(3). The Supreme Court has refused to apply a bright line test to determine what constitutes reasonable detention. Instead, each case must be examined in light of its own particular facts and what would be reasonable under the circumstances. See United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1574, 84 L.Ed.2d 605 (1985); Terry, 392 U.S. at 20, 88 S.Ct. at 1879.
To comply with the Fourth Amendment's proscription against unreasonable search and seizures, the nature and extent of a detention based on something less than probable cause must be "minimally intrusive". United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). In State v. Dickey, 152 N.J. 468, 706 A.2d 180, 184 (1998), the court stated:
The Terry Court created a two-part test designed to measure the reasonableness of an investigative stop against the intrusion on the detainee's right to be secure from unreasonable searches. Under this test, we must consider
whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.
(Quoting Terry, 392 U.S. at 20, 88 S.Ct. 1868).
Time is an important factor. In assessing the duration of a detention, the court must look to whether the police diligently acted to confirm or dispel their suspicions. See Place, 462 U.S. at 702, 103 S.Ct. 2637. The consideration of the nature of detention involves in part the "degree of fear and humiliation that the police conduct engenders." United States v. Lego, 855 F.2d 542, 544-45 (8th Cir.1988). While handcuffs do not in and of themselves signify an arrest, they heighten the degree of intrusion. See Dickey, 706 A.2d at 188.
Our supreme court has held that Terry does not prohibit the use of handcuffs "where the circumstances reasonably warrant such action." Reynolds v. State, 592 So.2d 1082, 1085 (Fla.1992). In Reynolds, the court stated:
[L]ikewise, we do not find Terry and its progeny to prohibit placing a suspect in handcuffs during the course of an investigative detention where the circumstances reasonably warrant such action. If an officer reasonably believes that an investigative stop can be carried out only in such a manner, it is not a court's place to substitute its judgment for that of the officer. United States v. Sharpe, 470 U.S. at 686-87, 105 S.Ct. at 1575-76; United States v. Glenna, 878 F.2d at 972-73. Accordingly, ... we find that police may properly handcuff a person whom they are temporarily detaining when circumstances reasonably justify the use of such restraint.
We do not suggest that police may routinely handcuff suspects in order to conduct an investigative stop. Whether such action is appropriate depends on whether it is a reasonable response to the demands of the situation. When such restraint is used in the course of an investigative detention, it must be temporary and last no longer than necessary to effectuate the purpose of the stop. The methods employed must be the least intrusive means reasonably available to verify or dispel in a short period of time the officers' suspicions that the suspect may be armed and dangerous. United States v. Glenna, 878 F.2d at 972. Absent other threatening *1149 circumstances, once the pat-down reveals the absence of weapons the handcuffs should be removed.

. . . .
Although we find that the initial handcuffing of Reynolds was appropriate, we find that the continued use of handcuffs after the pat-down was illegal. At that point, the officers had no reason to believe that weapons were present. According to the testimony of one of the officers, the suspects offered no resistance, were not particularly belligerent, and did not make any threats. Under these facts, the use of handcuffs after the pat-down was not reasonably justified under the circumstances.

Id. at 1085-86 (emphases supplied).
Applying the law to the facts of the case, and considering that the appellant has admitted that the initial stop and handcuffing was supported by reasonable suspicion, we find that the detention went beyond the point which was reasonable to confirm or allay the officers' suspicions. As of the second BOLO, the officers were no longer on the lookout for a Hispanic male, but a white male. After conducting a search, no weapons were found. The name on Melendez's driver's license and his date of birth did not match those of the suspect being sought. In addition, Melendez was otherwise cooperative. Thus, the officers had no additional suspicion to warrant further detention. There was no testimony that the clothing or other physical characteristics of either Melendez or his wife were similar to those described in the BOLO. The only similar characteristics of Melendez to the revised BOLO were that he was a male in a white compact Honda. The brief investigation gave no suspicion requiring additional inquiry. Holding Melendez beyond that time required probable cause for further detention.
Even if the thirty minute detention was reasonable in length, the continued handcuffing of Melendez was unauthorized under Reynolds. As stated previously, the officers searched Melendez, his wife, and their vehicle and discovered no weapons. There was no suspicion of flight. Both parties were cooperative. The handcuffs should have been removed once the officers' suspicions that Melendez might be armed and dangerous were dispelled. Because they were not, the seizure of Melendez was more than "minimally intrusive" and therefore had to be supported by probable cause. See Terry, 392 U.S. at 22, 88 S.Ct. 1868. As such, the trial court should have given an instruction on probable cause. Failure to do so was reversible error.
We affirm as to the other issues raised. However, because of the error in the jury instruction, we reverse and remand for a new trial.
SHAHOOD, J., and CHAVIES, MICHAEL B., Associate Judge, concur.
NOTES
[1] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).