**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1535-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

NICHOLAS F. GARREFFI,

     Defendant-Appellant.

_____

> Argued November 13, 2019 – Decided January 13, 2020
>
> Before Judges Yannotti, Hoffman and Currier.
>
> On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 15-08-1952.
>
> Molly O'Donnell Meng, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Molly O'Donnell Meng, of counsel and on the briefs).
>
> Regina M. Oberholzer, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Regina M. Oberholzer, of counsel and on the brief).

PER CURIAM

Defendant was found guilty of vehicular homicide and other offenses that arose out of a multiple-vehicle collision, in which one person suffered fatal injuries and three other persons sustained serious bodily injuries. Defendant appeals from the judgment of conviction dated October 17, 2017. We affirm.

I.

On August 5, 2015, an Atlantic County grand jury charged defendant with second-degree vehicular homicide (count one), N.J.S.A. 2C:11-5(b); and three counts of fourth-degree assault by auto while under the influence of an intoxicating narcotic, N.J.S.A. 2C:12-1(c)(2) (counts two, three, and four). Thereafter, the trial court denied defendant's motion to suppress the results of a sample taken of defendant's blood after the accident. Defendant was then tried before a jury.

At the trial, the State presented evidence which showed that on August 30, 2014, at approximately 8:30 a.m., defendant was driving his pick-up truck east on Route 40 in Hamilton, New Jersey on his way to work. Defendant's truck veered out of its lane, across the median, and onto the westbound side of the highway. The truck nearly missed one car before it clipped a box truck and then

hit the rear driver's side of a Volkswagen Jetta, which was being driven by M.W.[1]

The Jetta spun 360 degrees and stopped in the front yard of a house approximately 100 yards down the road. All of the airbags in the Jetta deployed and several windows shattered. The driver's door was bent and would not open, and the grass beneath the car was visible when the door was closed. After the collision with the Jetta, defendant's truck crashed into the woods and caught fire.

James Hollander was driving two cars ahead of the Jetta. He testified that he saw defendant's truck veer across the median and had to "swerve[] out of the way toward the shoulder" to avoid a collision. Thereafter, Hollander saw defendant "clip[]" a box truck and "hit [the car carrying the victims] head-on."

Darrell Jacobs was driving the box truck. He testified that he observed defendant's truck cross the median and enter his lane with enough time to correct itself. Jacobs told one of the responding officers that defendant was sitting straight up with his hands on the wheel and "appeared to be dazed . . . as the vehicle swerved towards him."

Jacobs testified that he felt the impact when defendant's truck struck "towards the rear" of the box truck. He saw defendant exit his truck and say,

---

[1] We use initials to identify the driver and others to protect their privacy.

"my tools, my tools are gone." Jacobs approached defendant and cursed him because he seemed concerned only about his tools while people had been injured in the crash.

All of the occupants of the Jetta sustained injuries. M.W. had a chest contusion and abrasions to her eye, arm, and face. G.S. sustained a concussion and a chest-wall injury, bruising, and pain in her right hip and leg. K.B. suffered injuries to her chest, back, upper thigh, and abdomen. She said she suffered from "really bad headaches" for months after the accident. S.W. had a laceration on her head. A.C. died from the injuries sustained in the collision.

Defendant was transported to a hospital, where a sample of his blood was taken. Analysis of the sample revealed the presence of alprazolam, a prescription medication commonly known as Xanax, at a concentration of thirty-five nanograms per milliliter. Defendant did not have a prescription for alprazolam.

Defendant presented several witnesses in his defense. The emergency medical technician who assisted defendant at the scene, and the emergency room doctor who evaluated defendant at the hospital, testified that he did not seem impaired. Defendant's sister-in-law stated that defendant did not seem impaired when she spoke with him for several minutes several hours before the collision.

A-1535-17T4

Defendant's father, a retired police officer, testified that when he arrived on the scene, defendant "absolutely" did not seem impaired. In addition, defendant presented testimony from a forensic psychiatrist regarding the effect of alprazolam.

The jury found defendant guilty on all counts. Defendant was sentenced on October 17, 2017. He appeals and raises the following arguments:

POINT I
THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS THE BLOOD DRAW BECAUSE HIS CONSENT WAS TAINTED BY HIS UNLAWFUL ARREST AND WAS NOT FREELY AND VOLUNTARILY GIVEN.

[A.] Defendant's Consent Was Tainted By His Unlawful Arrest.

[B.] Defendant's Consent Was Not Freely and Voluntarily Given.

POINT II
THE TRIAL COURT ERRED IN A) PERMITTING THE STATE TO INTRODUCE SCIENTIFICALLY UNRELIABLE RETROGRADE EXTRAPOLATION TESTIMONY AND B) PERMITTING DR. BRICK TO TESTIFY ABOUT THE ULTIMATE CAUSE OF THE ACCIDENT. (Not raised below).

[A.] The Trial Court Erred In Permitting the State to Introduce Admittedly Unreliable Retrograde Extrapolation Evidence.

A-1535-17T4

[B.]  The Trial Court Further Erred By Permitting Dr. Brick To Offer Impermissible Lay Opinion Testimony As To The Cause Of The Accident.

POINT III
IN THE ALTERNATIVE, THE MATTER MUST BE REMANDED FOR RESENTENCING. DEFENDANT'S SENTENCE IS EXCESSIVE BECAUSE THE TRIAL COURT ERRONEOUSLY FAILED TO FIND MITIGATING FACTORS 9 AND 11, IMPROPERLY FOUND AGGRAVATING FACTOR 9, AND FAILED TO ADEQUATELY WEIGH THE AGGRAVATING AND MITIGATING FACTORS.

POINT IV
DEFENDANT'S TWENTY-YEAR LICENSE SUSPENSION IS MANIFESTLY EXCESSIVE.

II.

We first consider defendant's argument that the trial court erred by denying his motion to suppress the results of the blood draw.  Defendant argues that his consent to the blood draw was not freely and voluntarily given.  He also argues that his consent was tainted by an allegedly illegal arrest.

A.  Legal Principles Governing Consent to Search.

The Constitution of the United States and the New Jersey Constitution protect individuals from unreasonable searches and seizures.  U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  The compelled intrusion into the body for the purpose of drawing blood to determine its alcohol content is a search under the

6

Fourth Amendment to the United States Constitution.  Schmerber v. California, 384 U.S. 757, 768 (1966).

"Warrantless searches are 'prohibited unless they fall within a recognized exception to the warrant requirement.'"  State v. Adkins, 221 N.J. 300, 310 (2015) (quoting State v. Pena-Flores, 198 N.J. 6, 18 (2009)).  Consent to search is, however, an established exception to the warrant requirement.  State v. Coles, 218 N.J. 322, 337 (2014).  Consent must be given voluntarily and knowingly; in New Jersey, the State has the burden to prove the consenting individual knew he or she had the right to refuse.  State v. Domicz, 188 N.J. 285, 308 (2006).

Whether consent was voluntary is a question of fact to be determined from the totality of all the circumstances.  Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).  The State must establish the voluntariness and validity of consent by clear and convincing evidence.  State v. King, 44 N.J. 346, 352 (1963).

The following factors indicate consent was given voluntarily: "(1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers."  Id. at 353.  (internal citations omitted).  On the other hand, the following factors indicate consent may have been the product of coercion:

7

(1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed.

[Id. at 352-53.]

B. Testimony at the Suppression Hearing.

Detective Sergeant Christopher K. Gehring of the Hamilton Township Police Department (HTPD) testified that on August 30, 2014, he was dispatched to respond to a serious motor vehicle accident on Route 40. Detective Michael F. Robison and two other officers were already on the scene. Gehring stated that he spoke with defendant and advised him he required a blood draw.

Gehring said the department's procedure was to transport the person to a hospital, read the consent form, and determine whether the person would consent or refuse to consent. If a person does not consent, he would apply for a search warrant.

Gehring explained the procedure to defendant, who was cooperative and had no questions. Officer Leo G. Rudolph transported defendant to the hospital. Gehring followed Rudolph and defendant to the hospital. Defendant was not

under arrest or handcuffed. They went into the emergency room, where the blood draw would take place. A nurse asked defendant if he was taking any medications, and defendant said he takes Suboxone.

Rudolph presented the consent form to defendant and reviewed it with him. Gehring noted the form explains that the procedure for the blood draw states that the person has the right to refuse to consent and requires the individual to sign the form. Gehring said defendant never expressed any concern about signing the form. Gehring was present when defendant's blood was taken. He stated that defendant never refused consent before, during, or after the procedure.

Gehring further testified that he questioned defendant about the accident and defendant was cooperative. Gehring said neither he nor any other officer used physical force against defendant. They never used loud or assertive language. Gehring stated that defendant was never threatened in any way, and he was not handcuffed during the process.

Robison testified that he responded to the scene of the accident and was briefed on the accident. He observed a burned vehicle in the woods. He spoke with defendant, who said he was "okay" but appeared "visibly upset." Defendant

A-1535-17T4

stated that he had been reaching for something in his truck, and he did not know what happened.

Robison told defendant that due to the seriousness of the accident, he was going to have to go to the hospital and provide a blood sample. Defendant nodded, indicating "yes." Robison explained that this was the procedure the department follows after an accident in which there is a fatality or possible fatality. Robison told defendant he would be presented with a consent form.

Robison testified that when he discussed the issue of consent, defendant was not in handcuffs. Robinson did not use any physical force or threats, and he did not speak loudly or use threatening language. Robison said he did not hear anyone threaten defendant or see defendant in handcuffs at any time.

Robison interviewed the driver of the box truck and two other drivers. They described the accident. They did not see defendant apply his brakes or try to avoid the other vehicle. Robison stated there was no evidence indicating defendant applied his brakes or adjusted his tires quickly.

In addition, Rudolph testified that defendant's truck was on fire when he arrived on the scene. He spoke with defendant, who explained he had been reaching for something in the truck and apparently crossed over the center line. Gehring spoke with defendant and instructed Rudolph to transport defendant to

the hospital for a blood draw. Rudolph's understanding was that defendant was going willingly to the hospital.

Rudolph drove defendant to the hospital in a police cruiser. Defendant was not under arrest or handcuffed. He took defendant to the emergency room and spoke to the nurse who would be performing the procedure. Rudolph presented defendant with the written request to withdraw a blood specimen. He read the form to defendant and presented it to him for his signature.

Rudolph read the form into the record. The form stated that defendant consented to having the nurse draw his blood, and he had been advised and understood he had the right to refuse to consent to the procedure. The form also stated, "Having been advised of my right to refuse, I consent to this procedure freely and voluntarily without force or fear, promise or threat." Rudolph witnessed defendant sign the form. He stated defendant was "very cooperative."

C. The Judge's Decision.

The judge issued a letter opinion dated March 9, 2016, in which he reviewed the testimony presented at the hearing and found that all three officers had testified "in a thorough, consistent and reliable manner." The judge determined that the State had established that defendant knowingly and voluntarily consented to have his blood drawn. The judge found that the

11

officers' testimony showed that defendant's consent was not the result of any coerciveness. The judge noted that defendant indicated his willingness to consent to the blood draw before he was arrested, and that defendant was cooperative.

The judge also noted that defendant's father was a retired police officer, who had come to the scene of the accident and spoke with defendant before Gehring arrived. The judge pointed out that defendant was not in custody or physically impaired when he gave consent. The judge found that Gehring and Robison had explained the law enforcement procedures to defendant, and while an officer indicated that a blood draw was required, this statement did not negate defendant's knowing and voluntary consent.

The judge then reviewed the factors identified in King, 44 N.J. at 346. The judge observed that defendant had not been arrested when he provided consent, the officer did not obtain consent despite an earlier denial of guilt, defendant never refused any request to consent, and defendant was not handcuffed. The judge noted that defendant may have been under the impression that the blood draw would not reveal the presence of alprazolam, or that such use would not impair his ability to operate a motor vehicle but gave little weight to this factor.

A-1535-17T4

In addition, the judge found that defendant gave his consent knowing he could refuse consent. The judge pointed out that the word "requirement" had been used describing the procedures and protocol for obtaining a blood sample, but defendant knew he had the right to refuse consent because he signed the consent form, which stated that defendant consented to the search, and he had been advised of his right to refuse.

The judge also noted that defendant had admitted responsibility for the crash before he provided consent. Moreover, defendant assisted the officers by providing statements regarding the accident at the scene and at the hospital.

D. Defendant's Arguments.

On appeal, defendant argues the State failed to establish he voluntarily consented to the blood draw. He contends his consent was coerced because the officers told him the blood draw was "required." However, as we have explained, the judge provided a thorough review of the totality of circumstances, reviewed the factors identified in King for determining whether consent is voluntary, and found that defendant's consent was knowing and voluntary. The record supports the judge's findings.

Defendant further argues that his consent was tainted by an allegedly illegal arrest. Defendant did not explicitly raise this argument at the suppression

hearing, but claims he preserved this issue for appeal because arrest is a factor in determining whether a consent is voluntary. Although defendant did not specifically preserve the issue for appeal, we will address his argument.

It is undisputed that the officer never told defendant he was under arrest before he consented to the blood draw. He claims, however, that he was subject to a de facto arrest.

In addressing this contention, we consider: (1) whether the detention involved "delay unnecessary to the legitimate investigation of the law enforcement officers"; (2) "the degree of fear and humiliation that the police conduct engender[ed]"; (3) whether the person was transported to another location or isolated from others, and (4) whether the person was handcuffed or confined to a police car. State v. Dickey, 152 N.J. 468, 479 (1998).

Here, defendant was involved in an accident with several vehicles, including a vehicle in which the four occupants were injured. The officers who responded to the scene understood that one of the victims may have suffered fatal injuries. The evidence does not support the conclusion that defendant was unnecessarily delayed by the investigation of the accident. Rather, the record shows that the officers acted in a reasonable and efficient manner while conducting a legitimate investigation of the collision.

A-1535-17T4

Furthermore, there is no evidence showing that defendant suffered fear or humiliation from any police conduct. As we have explained, defendant rode in the front seat of the police cruiser to the hospital and he was cooperative. Defendant's father, a retired officer of HTPD, was present at the scene and remained nearby while the officers conducted the investigation. There also is no evidence indicating that defendant was in fear or humiliated during the investigation.

Moreover, the record shows that defendant agreed to go to the hospital for the blood draw and did so willingly. He was not handcuffed or confined to the police car. We conclude that under the circumstances, a reasonable person would not believe an arrest had taken place. We therefore reject defendant's contention that his consent to the blood draw was tainted by an unlawful arrest.

III.

We next consider defendant's argument that the trial judge erred by permitting the State's expert witnesses to present certain testimony at trial. Defendant did not object to the testimony. Therefore, we consider whether the judge erred and, if so, whether the error was "clearly capable of producing an unjust result." R. 2:10-2.

Defendant argues that forensic toxicologist Ayako Chan-Hosokawa and Dr. John Brick improperly provided scientifically unreliable retrograde extrapolation testimony regarding the amount of alprazolam defendant consumed before the accident. Defendant contends there is no basis for retrograde extrapolation analysis for any substance other than alcohol.

The American Association of Forensic Sciences Standard Boards (ASB) defines retrograde extrapolation as the "estimation of a drug concentration . . . at a time other than the time of the sample collection." Association of Forensic Sciences Standard Boards, ASB Best Practice Recommendation 037, (1st ed. 2019). Here, neither witness provided retrograde extrapolation testimony.

Indeed, Ms. Chan-Hosokawa specifically stated that she was not providing such testimony. She testified as to how the concentration of alprazolam in defendant's bloodstream compared to generally-reported levels from a daily dose of three-milligrams, based on standard reference-comments in the industry. She said that in the field of forensic toxicology, it is not generally recommended to calculate the exact dosage an individual consumed based on the concentration revealed from a blood draw because doing so would not be exact due to "difference in our metabolism and all that."

16

In addition, Dr. Brick did not offer an opinion as to the level of alprazolam in defendant's blood at the time of the collision. The doctor estimated the minimum dosage an individual would have to consume immediately before a blood draw in order to have a concentration of 35 nanograms per milliliter in his or her bloodstream.

He opined that in order to reach such a concentration, a person would have to administer 2.4 to 3.4 milligrams of alprazolam intravenously. The doctor used a chart to illustrate a comparison between defendant's blood-alprazolam concentration in relation to a one milligram dose based on findings published in generally-accepted literature in the field of pharmacology.

Defendant did not object to the testimony and did not argue it was not admissible under N.J.R.E. 702. We conclude the trial court did not err by failing to preclude the testimony of the State's experts sua sponte. Moreover, defendant has not shown that the admission of the testimony was "clearly capable of producing an unjust result." R. 2:10-2.

Defendant further argues that the trial judge erred by permitting Dr. Brick to offer what defendant claims was an impermissible lay opinion as to the cause of the accident. Again, we disagree.

At trial, Dr. Brick testified there was evidence defendant had consumed alprazolam in an amount that would impair a person's ability to drive. He further testified that defendant's use of the drug was a substantial contributing factor to the accident. The doctor stated he was not aware of any other factor that could have caused defendant to fail to maintain control of his vehicle and keep it within his lane of travel.

Dr. Brick's opinions were permissible expert testimony. The doctor did not opine that defendant had been driving recklessly. Rather, Dr. Brick testified that defendant's use of alprazolam was a substantial contributing factor in defendant's failure to maintain control of his vehicle. The doctor's opinion was based on his knowledge of alprazolam, its potential to impair a person's ability to drive, and the facts of this case.

In support of his argument that Dr. Brick's testimony was improper, defendant relies on State v. Jamerson, 153 N.J. 318 (1998). In Jamerson, the medical examiner was qualified as a forensic pathologist in a case involving an auto accident that resulted in two deaths. Id. at 330. The medical examiner conducted his own investigation of the accident and testified that the deaths were homicides, defendant was reckless, and defendant's recklessness caused the deaths. Id. at 339.

The Court held that the testimony was improper because the medical examiner testified outside the scope of his expertise and opined the deaths were reckless homicides rather than accidental killings. Id. at 340-41. Here, Dr. Brick did not testify beyond the scope of his expertise, and he did not offer any opinions on the ultimate issue of whether defendant had driven recklessly. Thus, defendant's reliance on Jamerson is misplaced.

IV.

Defendant further argues his sentence is excessive. He also contends the judge erred by imposing a twenty-year license suspension.

When reviewing a sentence imposed by the trial court, we apply a "deferential" standard of review. State v. Fuentes, 217 N.J. 57, 70 (2014). We will "not substitute [our] judgment for that of the sentencing court." Ibid.

We must uphold the trial court's sentencing decision unless: (1) the court did not comply with the sentencing guidelines; (2) the court's findings on the aggravating and mitigating factors were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience." Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

A-1535-17T4

Here, the judge found aggravating factors three and nine, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense), (9) (need to deter defendant and others from violating the law). The judge also found mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) (defendant has no prior history of delinquency or criminal activity). The judge found that the aggravating factors outweighed the sole mitigating factor.

The judge sentenced defendant on count one (vehicular homicide) to seven years of incarceration, with an 85% period of parole disqualification, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On counts two, three, and four (assault by auto while intoxicated), the judge sentenced defendant to three 365-day prison terms, each to run consecutively to each other. In addition, the judge found defendant guilty on three motor vehicle summonses, dismissed a fourth summons, and imposed a twenty-year license suspension. The judge also imposed appropriate fines and penalties.

On appeal, defendant argues the judge erred by finding aggravating factor nine. He contends the prison sentence imposed should be sufficient to deter him from committing any future offenses. We note, however, that at sentencing, defendant conceded this factor was applicable.

In any event, the judge found there was a need to deter defendant and others from violating the law. The judge noted that defendant had admitted longstanding substance abuse. In addition, the record shows that defendant was arrested in 2016 for driving under the influence of Suboxone while on release pending the trial in this matter. There is sufficient evidence in the record to support the judge's finding of aggravating factor nine.

In addition, defendant contends the judge erred because he did not find mitigating factor nine, N.J.S.A. 2C:44-1(b)(9) (defendant's character and attitude indicate it is unlikely he will commit another offense). We disagree. The evidence supporting the finding of aggravating factor nine also supports the judge's conclusion that mitigating factor nine did not apply.

Defendant further argues that the judge erred by failing to find mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) (defendant's incarceration would entail excessive hardship to defendant or his dependents). Defendant asserts that he was actively involved in the lives of his children and worked sixty hours per week to support his family.

The judge noted, however, that any term of incarceration will cause defendant some hardship, and there was no evidence that the hardship to defendant or his family would be greater than the hardship suffered by any other

21

person sentenced to a term of imprisonment. The record supports the judge's conclusion that mitigating factor eleven does not apply.

Defendant also contends the judge erred by imposing a twenty-year license suspension. Defendant argues the length of the suspension is excessive. He maintains the judge erred by failing to conduct an analysis pursuant to State v. Moran, 202 N.J. 311 (2010).

In Moran, the Court noted that N.J.S.A. 39:5-31 permits a municipal court or Law Division judge to suspend a person's license to drive if the person had been found guilty of a willful violation of the laws governing the operation of a motor vehicle. Id. at 315 (citing N.J.S.A. 39:1-1 to 39:5G-2). The Court stated that in determining the length of a license suspension to be imposed pursuant to N.J.S.A. 39:5-31, a judge should consider

> [T]he nature and circumstances of defendant's conduct, including whether the conduct posed a high risk of danger to the public or caused physical harm of property damage, the defendant's driving record, including the defendant's age and length of time as a licensed driver, the number, seriousness, and frequency of prior infractions, whether the defendant was infraction-free for a substantial period before the most recent violation or whether the nature and extent of the defendant's driving record indicates that there is a substantial risk that he or she will commit another violation; whether the character and attitude of the defendant indicate that he or she is likely or unlikely to commit another violation; whether the defendant's

22

conduct was the result of circumstances unlikely to recur; whether a license suspension would cause excessive hardship to the defendant and/or dependents; and the need for personal deterrence.

[Id. at 328-29.]

Here, the judge did not impose the license suspension under N.J.S.A. 39:5-31. Rather, the license suspension was imposed pursuant to N.J.S.A. 2C:11-5(c)(5), which permits a suspension from five years to life. Moreover, the record supports the court's imposition of a twenty-year license suspension.

As we have explained, defendant ingested alprazolam, for which he did not have a prescription, in an amount that would impair his ability to drive. He then drove his truck, failed to maintain his lane, and caused a collision that resulted in the death of one individual and injuries to three other persons. Moreover, while on release pending trial in this case, defendant was charged with driving under the influence of Suboxone.

In addition, defendant's pre-sentence report includes his driving abstract, which shows that defendant's license had been suspended five times between 1994 and 2005. The abstract also shows that defendant had been stopped twice in 2005 for driving while his license was suspended. We are convinced the twenty-year suspension was not a mistaken exercise of discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1535-17T4