**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1072-19T3

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

BENITO GERMAN-ROSARIO
and SANTA DELACRUZ-
GARCIA,

      Defendants-Appellants.

_____

Argued January 27, 2020 – Decided March 23, 2020

Before Judges Sumners, Geiger and Natali.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-10-1463.

Milagros De La C. Camacho, Assistant Deputy Public Defender, argued the cause for appellant Benito German-Rosario (Joseph E. Krakora, Public Defender, attorney; Milagros De La C. Camacho, of counsel and on the brief).

Michael J. DeBlis, Jr. argued the cause for appellant Santa Delacruz-Garcia (Michael J. DeBlis, Jr.,

attorney, joins in the brief of appellant Benito German-Rosario).

William P. Miller, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; William P. Miller, of counsel and on the brief; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

After the trial court in a July 19, 2019 order denied defendants Benito German-Rosario's and Santa Delacruz-Garcia's application to suppress evidence seized from their vehicle after a routine traffic stop and refused to hear their motion for reconsideration, we granted their motion for leave to appeal. On appeal, defendants raise the following issues for our consideration:[1]

> POINT I
>
> THE COURT ERRED IN DENYING THE MOTION TO SUPPRESS EVIDENCE SEIZED DURING A WARRANTLESS SEARCH HAVING IMPROPERLY CONCLUDED THAT ROSARIO CONSENTED TO SAID SEARCH.
>
> A. Police officers did not have a sufficient reasonable and articulable suspicion to detain and question Rosario.

---

[1] Garcia did not file a separate brief on appeal, electing instead to rely upon Rosario's brief.

A-1072-19T3

B. Once the traffic stop evolved into an investigative detention, the police were required to provide [Rosario] with Miranda[2] warnings before any further questioning occurred. Furthermore, they were obligated to cease all questioning of him once [Rosario] requested an attorney.

C. [Rosario]'s consent was neither voluntarily nor knowingly given as it was the product of both coercion and misinformation.

D. Gilmore conducted a search of Rosario's vehicle before Rosario executed the Consent to Search form.

POINT II

THE TRIAL COURT ERRED IN DECLINING TO RECONSIDER ITS ORDER OF JULY 19, 2019.

Having reviewed defendants' arguments in light of the record and applicable law, we affirm in part and vacate and remand in part. We affirm the court's July 19, 2019 order as to Point I.A. With respect to Point I.B, we affirm the court's order to the extent that we conclude no Miranda violation occurred prior to Gilmore's entry into defendants' vehicle at 18:39:03 of the motor vehicle recording (MVR) but vacate the order and remand for further proceedings for the court to make factual findings as to whether any Miranda violation occurred following that event. We also vacate the order as to Points I.C and I.D, and

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1072-19T3

remand for the trial court to make factual findings regarding the effect of Gilmore's entry into defendants' vehicle on the consent issues raised by defendants and to address substantively defendants' motion for reconsideration.

I.

The following facts are gleaned from the testimony of Ridgefield Park Patrolmen Bradley Gilmore and Joseph Avila-Reyes over the course of four non-consecutive suppression hearing dates, as well as the MVR footage supplied in the record. Gilmore testified that he underwent "well over 500 hours of training specific to narcotics," organizes narcotic-type training throughout New Jersey, and "teach[es] law enforcement throughout the United States on deceptive behavior and aftermarket hidden compartments." The court found Gilmore "qualified to render opinion testimony" on identifying drug traffickers. Avila-Reyes testified regarding his expertise in Spanish translation, that he is "very often" asked to report to traffic stops to translate for an officer, and that he had done so "[e]asily over a hundred times."

At approximately 6:30 p.m. on May 28, 2017, Gilmore observed defendants' vehicle exiting the roadway on a ramp to Route 46 East in Ridgefield Park. He estimated the vehicle, a 2004 Volvo XC90, was traveling

4

approximately sixty miles per hour in a fifty-mile-per-hour zone,[3] and noticed that "the front-end of the vehicle dipped down indicating that the driver abruptly was pressing his brakes . . . ."  He also observed windows which appeared to be tinted darker than legally authorized.  Gilmore stopped the vehicle on Route 46 and the driver pulled into a gas station parking lot.

Gilmore approached the passenger side of the vehicle and Rosario, the driver, said "[n]o English, no English."  Upon request, Rosario nevertheless produced his driver's license and registration.  When Rosario opened the glove box to retrieve his identification, Gilmore noticed that it was empty except for the documents and a screwdriver.  He also observed:  1) a flip phone on the steering column which had a phone number taped to it; 2) two smartphones in the center console; 3) a lone key in the ignition with no key ring; 4) no E-Z Pass transponder; 5) the "overwhelming odor of air fresheners"; and 6) "several air fresheners on the floor[]," specifically behind the passenger seat.  Gilmore noticed that the passenger, later identified as Garcia, had her "seat . . . pushed

---

[3]  Although the posted speed limit was fifty miles per hour, Gilmore noted that he pulled Rosario over in part because the exit ramp had a speed limit sign that recommended traveling "[twenty-five] miles per hour" and "[t]he general motoring public travels from [twenty-five] to [thirty-five] miles per hour" on that ramp.

so . . . close to the dashboard that her knees were buckling" and that her knees "were on top of the dashboard" with her feet off the ground.

Gilmore testified that flip phones "are often used by those involved in criminal activity because there's no contract needed in order to obtain one," which is a method by which "they can go undetected by law enforcement." He further stated that a single ignition key is commonly used in drug trafficking because the vehicle is "used only for the sole purposes of trafficking," and that "many different people may get into that vehicle and . . . are given that key to go conduct their illicit activity."

Gilmore explained that the lack of an E-Z Pass transponder is common among vehicles used in drug trafficking because where there is "a credit card associated with that E-Z Pass, it creates a nexus," and that "the operator always wants to attempt to distance themselves." In addition, he noted that drug traffickers "often use masking agents," such as "numerous air fresheners strewn about the vehicle in order to mask . . . the odor of narcotics . . . ." Finally, he explained that in a Volvo XC90, "the most common location for an aftermarket hidden compartment is underneath the front passenger seat," as there were "two floors in the vehicle" which "traffickers . . . will often utilize . . . [for] an aftermarket hidden compartment."

A-1072-19T3

After Gilmore made these observations, he asked Rosario to exit and walk to the rear of the vehicle. Gilmore then attempted to speak "the little bit of Spanish that [he] knew" to Rosario and asked him where he was coming from and where he was going. Rosario stated he left from Newark and was going to the Bronx to visit family. Gilmore explained to Rosario in English that he pulled him over because Rosario was speeding, but he believed Rosario did not understand him. Next, Gilmore returned to the vehicle to speak with Garcia, who corroborated Rosario's statement regarding Newark and the Bronx. Before returning to the vehicle, Gilmore called for back-up.

Upon returning to the vehicle, Gilmore noticed that the flip phone was no longer on the dashboard. When he asked Rosario about its whereabouts, Rosario returned to the vehicle, retrieved a different cell phone from the cup holder, and handed it to Gilmore. Gilmore then clarified that he was looking for the flip phone from the dashboard. In response, Rosario spoke in Spanish to Garcia, who removed the flip phone from her purse and handed it to Rosario. Although Rosario indicated he would hand the phone to Gilmore, he pulled it back.

When Gilmore asked Rosario about the phone, he responded "Medicaid, Medicaid, Medicaid." Gilmore observed that Rosario seemed "anxious,"

7

"sway[ed] back and forth," and breathed "very, very heavily." Rosario again offered the cell phone and pulled it back.

Another officer then arrived at the scene. Gilmore asked Garcia to exit the car to speak about the flip phone. She exited the vehicle with her bags, but Gilmore asked her to leave them in the vehicle. When Gilmore mentioned the flip phone, Garcia likewise stated "Medicaid." Gilmore then returned to his patrol vehicle and asked for Avila-Reyes to come to the scene to translate. While waiting for Avila-Reyes to arrive, Gilmore provided police headquarters with Rosario's driver's license and requested a criminal history and warrant check.

Garcia stated she was cold, and when Gilmore allowed her to retrieve her coat from the vehicle, she sat in the passenger seat. Gilmore told her to exit the vehicle, but she claimed to also need her purse, which Gilmore did not permit her to retrieve. As Garcia exited the vehicle, she left the passenger door open. Garcia then returned to the front of the patrol vehicle.

Avila-Reyes arrived and confirmed Rosario's statement that he had left from Newark to go to the Bronx to see family. Gilmore then attempted to have Avila-Reyes ask about the flip phone, but before Avila-Reyes could translate, Rosario, in Spanish, stated that the phone was provided by Medicaid in order

for him to contact doctors for his health issues, and that the provider allowed 300 minutes per month. Avila-Reyes asked whether Rosario had ever been arrested, and he replied, "one time . . . but not a case." When asked about the car's tinted windows, Rosario said he had only owned the vehicle for one month and that he was "going to take that off."

Gilmore then asked Rosario to stand back from the vehicle. Gilmore walked over to the open front passenger door and at 18:39:03 of the MVR footage entered the passenger area. He then walked around the front of the vehicle with his flashlight in hand before returning to his patrol vehicle. Upon returning to Rosario's vehicle, Gilmore walked around to the driver's side and looked through the window with his flashlight, as well as underneath the vehicle. He then walked to the passenger side and stood in the open front passenger doorway with his flashlight.[4]

---

[4] It appears from the record that the court's findings that "[w]hen Garcia got out of the car, Gilmore was able to see the front of the amplifier . . . and he noticed that one of the bolts or screws designed to affix the amplifier to the floor was missing and that one was damaged," were based on Gilmore's viewing of the interior with his flashlight while standing in the open passenger doorway and not when he entered the vehicle at 18:39:03 of the MVR. Our finding that Gilmore entered the vehicle is based on our review of the same MVR footage considered by the trial court. See State v. S.S., 229 N.J. 360, 374-75 (2017) (clarifying the limited scope of appellate review of factual findings based on video evidence).

Gilmore testified that he was searching for a hidden compartment because "the most common location for an aftermarket hidden compartment in th[at] particular vehicle" was beneath the front passenger seat. He noticed that underneath the front passenger seat, the right bolt holding the amplifier down was gone and the left bolt was tooled.[5]

Gilmore then requested that Avila-Reyes ask Rosario whether he had any illegal items in the vehicle. When Rosario answered "no, I don't have anything illegal in the vehicle," Gilmore asked if he would consent to a search of the vehicle. In response to Avila-Reyes, Rosario stated "[y]es, tell him that I don't have anything illegal." Gilmore then handed Avila-Reyes a consent form in English and asked him to translate it to Spanish for Rosario.

At this point, Avila-Reyes informed Rosario that "Gilmore was asking for permission to [s]earch the [v]ehicle," that Rosario "had a right to say no," "could be there seeing the search as it happened," and that "once [Gilmore] began the search, [Rosario] could also say to stop." Rosario then stated that Gilmore was

---

[5] According to Gilmore, "a stock amplifier . . . sits underneath the front passenger seat," and to create a hidden compartment in that location, "[a]ll they would need to do . . . is to take the bolts off and install a locking mechanism." Gilmore clarified that four bolts hold the amplifier down "[a]nd there's no reason to ever have to remove those bolts," so it is "unusual" to see "a lot of tooling marks or marks of wear and tear" on the bolts.

A-1072-19T3

treating him like a "delinquent" and "putting pressure on" him, and that he was "going to call [his] lawyer." Avila-Reyes told Rosario he did not have to call anyone, and that Gilmore was not treating him badly.

Rosario then explicitly stated that Gilmore "can check [his] car." Avila-Reyes again showed Rosario the consent form and reiterated that signing the form meant that Rosario would give permission to check the vehicle, that he "can say no", that he was "going to be right here watching the situation," and that "after [Gilmore] start[ed], [Rosario] can tell him to stop." Rosario responded by saying "[y]es . . . I have to call a person who knows about laws . . . ."

At that point, Gilmore told Avila-Reyes to notify Rosario that "if he's gonna say no, then we'll get a canine, just say yes or no." Avila-Reyes again asked "[d]o you want to let [Gilmore] check or no," to which Rosario responded "[u]h-huh," but asked for Gilmore's "motive" and why Gilmore was "putting . . . pressure on" him. He also stated he did not know the law and was going to "call a person" who did.

Avila-Reyes once again clarified that Rosario "can say no" to the search, and Rosario answered "yes," and then "[n]o. I don't want him to check my car." Gilmore responded by saying "[o]kay, we'll just call a canine. Tell [Rosario]

that we're gonna call a canine," and instructed the other officer at the scene to do so. Rosario answered "[n]o, hey go ahead, come on . . . ." Avila-Reyes asked whether they should get a canine, and Rosario responded "[o]h no, no . . . [g]o ahead, check, check, check. There's no problem, there's no problem."

Noting Rosario's inconsistent answers, Avila-Reyes suggested they "might as well do a canine [search], [be]cause he's going back and forth." Gilmore again asked Rosario whether he could search the vehicle, and Rosario replied "yeah, yeah, yeah." In response, Gilmore informed Rosario that he had to sign the form because if he did not, the search would not occur. Rosario answered "[n]o, no go ahead," and asked Avila-Reyes to "[t]ell [Gilmore] to go ahead." Avila-Reyes asked Rosario "[d]o you understand what I read to you," and Rosario responded "[y]es, yes, that's it." Rosario then signed the consent form.

Gilmore's search revealed an aftermarket hidden compartment under the front passenger seat that contained two vacuum-sealed bags, one containing cocaine and the other heroin. The officers arrested defendants and issued citations to Rosario for driving with an expired license, speeding, operation of a vehicle while in possession of a controlled dangerous substance, and violation of a "safety glass requirement."

A-1072-19T3

A grand jury returned an indictment charging defendants with: 1) third-degree possession of heroin, in violation of N.J.S.A. 2C:35-10(a)(1); 2) first-degree possession of five ounces or more of heroin with the intent to distribute, in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1); 3) third-degree possession of cocaine, in violation of N.J.S.A. 2C:35-10(a)(1); and 4) first-degree possession of cocaine with intent to distribute, in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1).[6]

Defendants filed a motion to suppress the physical evidence seized and statements they made without being provided Miranda warnings. Defendants asserted the police never validly obtained consent to search the vehicle because they pressured Rosario with the threat of a canine search, and therefore "all evidence obtained by the police . . . [was] either the "poisonous tree" itself or the "fruit of the poisonous tree . . . ." Further, defendants contended that Gilmore violated Rosario's Fifth Amendment right to counsel because he asked for a lawyer "on five different occasions."

---

[6] Garcia was also charged with third-degree transporting or possession of property believed to be from criminal activity, in violation of N.J.S.A. 2C:21-25(a).

The court denied defendants' motion to suppress in a nine-page written opinion and corresponding July 19, 2019 order. The court found Gilmore "credible in his assessment of Rosario's speed" and that he was capable of "readily tell[ing] the difference between a car travelling at" twenty-five miles per hour as compared to one travelling at sixty miles per hour. It also found Avila-Reyes to be "credible and believable" because his testimony "matche[d] the images and the dialogue" in the MVR.

The court concluded that Gilmore's stop did not violate Rosario's constitutional rights because he was "travelling on an exit ramp at more than twice the posted speed limit." Next, it found that Gilmore's decision to prolong the traffic stop was permissible based on: 1) Gilmore's "expertise in the area of identifying drug traffickers"; 2) Gilmore's plain view observations of the vehicle at the time of the initial traffic stop; 3) the fact that "while Garcia remained in the front seat, the flip phone was removed from view and secreted"; and 4) the fact that "[w]hen Garcia got out of the car, Gilmore was able to see the front of the amplifier . . . and he noticed that one of the bolts or screws designed to affix the amplifier to the floor was missing and that one was damaged." In this regard, the court determined that those circumstances allowed for "reasonable

14

suspicion" that defendants were engaged in drug trafficking and justified Gilmore's "request[] [that Rosario] consent to search his vehicle."

As to the validity of Rosario's consent to search the vehicle, the court found that Rosario's "freedom to move about freely was minimally affected" as the encounter from the traffic stop to Rosario's signing the consent form lasted only twenty-two minutes. Further, Avila-Reyes translated and read the consent form to Rosario and "explained that Rosario was free to consent or to withhold consent," as well as that he was able to "watch as Gilmore searched the vehicle and . . . was entitled to tell Gilmore to stop searching his vehicle . . . at any time."

Based on the MVR footage and Avila-Reyes's "credible and believable" testimony, the court found that Rosario "made a decision as to the odds of his drugs being discovered by human search versus a drug sniffing dog," and that he "chose to hope that Gilmore would be unable to find the drugs on his own given the sophisticated secretion." As such, the court determined "that Rosario knowingly and voluntarily consented to allow Gilmore to search his vehicle." Finally, the court also found that because defendants "were not questioned after being arrested and while in custody[,] [t]heir statements [were] admissible."

Defendants filed a motion for reconsideration, attaching a certification from an investigator summarizing his interview with the Parts Manager at a local Volvo dealership that detailed the limited visibility of the amplifier from outside the vehicle. At an August 12, 2019 hearing, the court informed defendants that it would "decline to hear [their] motion for reconsideration" because it "didn't misunderstand" the facts and believed defendants were attempting to put "extraneous information" in the record. In response, counsel for Rosario sought clarification and noted that it seemed as if the court "actually [was] considering the motion, [had] considered the motion, and [was] ruling on the merits of the motion." The court stated that it was "not deciding the merits . . . of th[e] motion" because it was permitted, "in [its] discretion . . . to correct the [c]ourt's error or oversight," but that "there [was] no oversight or error for [it] to correct," and reiterated that it "decline[d] to hear a motion for reconsideration."

The next day, the court issued an order that denied defendants' request for a stay pending appeal of its July 19, 2019 order and its August 12, 2019 decision not to hear defendants' motion for reconsideration.[7] As noted, we granted defendants' motion for leave to appeal.

---

[7] While the August 13, 2019 order references an "[o]rder of August 12, 2019 declining to reconsider the [d]efendants' motion to suppress," no such August

In defendants' first point, they maintain that the trial court erred in denying their motion to suppress evidence seized from the initial warrantless search because Gilmore improperly performed an investigative detention. They also argue that the evidence should be suppressed because they were subject to a custodial interrogation and were not provided Miranda warnings. Further, defendants maintain that Rosario's consent to search the vehicle was invalid because he was coerced and misinformed as to his rights. Moreover, they argue that Rosario's consent was involuntary because he acquiesced only after Gilmore threatened to call a drug-sniffing dog. In addition, they maintain that the search was invalid because Gilmore illegally searched the vehicle prior to receiving Rosario's consent. Finally, defendants contend the trial court erred by declining to consider their motion for reconsideration.

We disagree with defendants' assertion that the initial traffic stop was invalid and that the police were required to administer Miranda warnings at any

_____

12, 2019 order appears in the record. The August 13, 2019 order enumerates four reasons for its denial of a stay pending appeal, including that defendants' "motion for reconsideration was filed on the [twentie]th day after [its] decision and . . . [the court] declined to hear [defendants'] motion [for reconsideration] on August 12, 2019 in court." As such, it is unclear whether the court memorialized its August 12, 2019 decision not to consider defendants' motion for reconsideration in a written order.

point prior to Gilmore's entry into the vehicle at 18:39:03 of the MVR.[8] We do not, however, reach the remainder of defendants' substantive arguments because we conclude the factual record is incomplete regarding the effect, if any, of Gilmore's entry into the vehicle prior to receiving consent and whether any such entry resulted in a Miranda violation or coerced consent.

## II.

An appellate court reviewing a motion to suppress "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Handy, 206 N.J. 39, 44 (2011) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). "A trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). "Video-recorded evidence is reviewed under the same standard." State v. Hagans, 233 N.J. 30 (2018). The court's legal conclusions, however, are reviewed de novo and not entitled to deference by an appellate court. Handy, 206 N.J. at 45.

---

[8] As detailed, infra, we do not suggest by this comment that Miranda warnings were required afterward. Rather, additional factual findings are necessary before we can reach a conclusion on that issue.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by requiring warrants issued on probable cause. "Under our constitutional jurisprudence, when it is practicable to do so, the police are generally required to secure a warrant before conducting a search . . . ." State v. Hathaway, 222 N.J. 453, 468 (2015) (citations omitted). One exception, however, is an investigatory stop. See Elders, 192 N.J. at 246.

"A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions." State v. Dunbar, 229 N.J. 521 (2017) (citing Arizona v. Johnson, 555 U.S. 323, 333 (2009)). To stop a vehicle, the officer must have "'a reasonable and articulable suspicion that the driver of a vehicle, or its occupants, is committing a motor-vehicle violation or a criminal or disorderly persons offense.'" Id. at 533 (quoting State v. Scriven, 226 N.J. 20, 34 (2016)). Once a vehicle is stopped, "a police officer may inquire 'into matters unrelated to the justification for the traffic stop.'" Dunbar, 229 N.J. at 533 (quoting Johnson, 555 U.S. at 333). An officer may check the driver's license, the vehicle's registration, and proof of insurance. Ibid.

If then, "the circumstances 'give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions.'" Ibid. (alterations in original) (quoting State v. Dickey, 152 N.J. 468, 479-80 (1998)). The stop may not be unreasonably prolonged "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 533-34 (quoting Rodriguez v. United States, 575 U.S. 348, 355 (2015)); see also Dickey, 152 N.J. at 476-79 (noting detention can become unlawful if longer than needed to diligently investigate suspicions).

The record supports the trial court's conclusion that the traffic stop conducted by Gilmore was proper, as he determined Rosario was speeding based on his experience and observations. Once Gilmore conducted the stop, under the totality of the circumstances, there is sufficient credible evidence in the record to support the court's conclusion that "[t]o a person who has had Gilmore's training and experience in the area of drug trafficking," defendants' conduct "undoubtedly raises a reasonable suspicion." For example, the court found that Gilmore had expertise and "has attended more than 500 hours of training on the topic of identifying drug traffickers," and that, therefore, he was qualified to testify regarding that topic.

A-1072-19T3

Further, the court found that upon approaching the vehicle, Gilmore observed various indicia of drug trafficking. Gilmore testified extensively as to the reasons why he suspected defendants to be involved in drug trafficking. By way of example, Gilmore testified that flip phones of the type he observed on the dashboard "are often used by those involved in criminal activity because there's no contract needed in order to obtain one," and so "it's a way that they can go undetected by law enforcement." Gilmore also testified as to the significance of the vehicle's lack of an E-Z Pass transponder, the use of air fresheners as masking agents, and Garcia's seating arrangement. Thus, the court properly concluded that Gilmore was justified in prolonging Rosario's detention in order to satisfy his suspicions that defendants were engaged in drug trafficking. See Dunbar, 229 N.J. at 533.

### III.

Defendants next argue that the heroin and cocaine secreted under the passenger seat and discovered in the search should be suppressed because the officers questioned them without reading their Miranda warnings and badgered Rosario for consent after he had stated that he was going to call his lawyer. As noted, we conclude that no Miranda violation occurred prior to Gilmore's entry into the vehicle as detailed at page 9, supra. We remand, however for further

21

proceedings to determine whether Gilmore violated defendants' <u>Miranda</u> rights following that event.

The Fifth Amendment of the United States Constitution guarantees all persons the privilege against self-incrimination. <u>U.S. Const.</u> amend. V. This privilege applies to the states through the Fourteenth Amendment. <u>U.S. Const.</u> amend. XIV; <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965). Further, New Jersey recognizes a common law privilege against self-incrimination, which has been codified in statutes and rules of evidence. N.J.S.A. 2A:84A-19; N.J.R.E. 503; <u>State v. Reed</u>, 133 N.J. 237, 250 (1993). That privilege affords any person taken into custody or otherwise deprived of his or her freedom, to be provided certain warnings before questioning can commence. <u>Miranda</u>, 384 U.S. 436.

The requirement that an individual be provided with <u>Miranda</u> warnings is triggered by a "'custodial interrogation,' which is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of . . . freedom of action in a significant way.'" <u>State v. Smith</u>, 374 N.J. Super. 425, 430 (App. Div. 2005) (quoting <u>Miranda</u>, 384 U.S. at 444). An individual is deemed to be in custody if "the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he [or she] could not leave freely." <u>State v. Coburn</u>, 221 N.J.

22

Super. 586, 596 (App. Div. 1987) (citing State v. Godfrey, 131 N.J. Super. 168, 176 n.1 (App. Div. 1974)). Under this objective test, courts consider the time, location, and duration of the detention, the nature of the questioning, and the conduct of the officers in evaluating the degree of restraint. See, e.g., Smith, 374 N.J. Super. at 431; State v. Pierson, 223 N.J. Super. 62, 67 (App. Div. 1988).

Conversely, "Miranda is not implicated when the detention and questioning is part of an investigatory procedure rather than a custodial interrogation." Pierson, 223 N.J. Super. at 66 (citing United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1981)). Such an investigatory procedure has included detention and questioning during a traffic stop. See Berkemer v. McCarty, 468 U.S. 420, 437-38 (1984) (holding that because a vehicle stop is "presumptively temporary and brief" and "public, at least to some degree[,]" it does not automatically trigger the Miranda requirement). In such circumstances, even though an individual's freedom of action is clearly restrained to a degree, Miranda warnings are only required if, under the totality of the circumstances, the detention becomes "the functional equivalent of an arrest." Smith, 374 N.J. Super. at 431 (quoting Berkemer, 468 U.S. at 442); see also State v. Nemesh, 228 N.J. Super. 597, 606–07 (App. Div. 1988).

Our state courts have applied the Berkemer reasoning in analyzing whether Miranda warnings are required during a routine traffic stop. In State v. Hickman, 335 N.J. Super. 623, 631 (App. Div. 2000), we held that "[r]oadside questioning of a motorist is not transformed into 'custodial interrogation' that must be preceded by Miranda warnings simply because a police officer's questioning is accusatory in nature or designed to elicit incriminating evidence." Relying on Berkemer, we noted that a police officer telling a defendant he looked "really nervous" and asking if he had any contraband in the vehicle was not equivalent to a formal arrest and did not require the administration of Miranda warnings. Id. at 632.

Here, Gilmore performed a motor vehicle stop and made preliminary inquiries of Rosario because he observed the vehicle speeding. Gilmore's initial questioning of Rosario was brief, and he was neither handcuffed nor placed under arrest during the initial investigation. Moreover, while Gilmore observed that Rosario was "anxious," "sway[ed] back and forth," and breathed "very, very heavily," the preliminary encounter we address in our opinion did not rise to the level of the functional equivalent of an arrest. See Hickman, 335 N.J. Super. at 631-32.

Under the totality of the circumstances, there is sufficient credible evidence in the record to establish that, from the time of the traffic stop until the time that Gilmore entered the passenger area of the vehicle, defendants were not subject to a custodial interrogation and <u>Miranda</u> warnings were not required.[9] <u>See</u> <u>Berkemer</u>, 468 U.S. at 441-43; <u>Hickman</u>, 335 N.J. Super. at 632; <u>State v. Smith</u>, 307 N.J. Super. 1, 9 (App. Div. 1997). Thus, at that time, defendants also did not have a Fifth Amendment right to counsel, and their statements were admissible. On remand, however, the court should determine the effect of Gilmore's entry into the vehicle prior to receiving consent including whether any <u>Miranda</u> violation occurred following that entry.

IV.

In defendants' remaining substantive points, they argue that Gilmore illegally searched the vehicle by "sticking the upper half of his body into the vehicle" prior to receiving Rosario's consent and that Rosario's eventual consent to search the vehicle was invalid because he was coerced and misinformed as to his rights. As noted, we do not reach those arguments because the trial court did not make factual findings regarding the effect, if any, of Gilmore's entry into

---

[9] Again, we do not suggest in this opinion that <u>Miranda</u> warnings were required later during the course of the stop, only that more complete findings are necessary to resolve that issue appropriately.

the vehicle (as described) and any observations he may have made, on the consent obtained and subsequent search.

Defendants rely upon State v. Holland, 176 N.J. 344, 363 (2003), for the proposition that "when the same officer participates in an improper search and in an arguably lawful one occurring only a short time later, the State's burden in demonstrating the validity of the second search will be most difficult." In this regard, defendants maintain that because Gilmore conducted an illegal search when he reached "the upper half of his body into the vehicle" prior to Rosario signing the consent form, see State v. Taylor, 81 N.J. Super. 296, 306-07 (App. Div. 1963), and that action allowed Gilmore to "notice[] that a bolt on the amplifier was missing and that another bolt appeared to have been tampered with, . . . the consent search was a direct result of the officer's unlawful entry into the vehicle" and thus was unconstitutional.

In its sole response, the State, relying upon In re J.A., 233 N.J. 432 (2018), maintains that even if Gilmore did enter the vehicle prior to obtaining Rosario's consent, "the alleged entrance had nothing to do with the police obtaining consent." In J.A., the Supreme Court held that the exclusionary rule does not apply where seizure of evidence was not the result of "exploitation" of unconstitutional police action or was "of a 'means sufficiently distinguishable'

from the constitutional violation such that the 'taint' of the violation was 'purged.'" Id. at 447 (quoting State v. Shaw, 213 N.J. 398, 414 (2012)).

Based on our independent review of the MVR, as noted in footnote 4, Gilmore clearly entered the passenger area of the vehicle prior to obtaining Rosario's verbal or written consent. The court, however, did not make findings or legal conclusions regarding the effect of Gilmore's entry prior to receiving Rosario's consent, whether his purpose in doing so was to observe the amplifier, the tooled bolts (and if he did so), or some other reason, or whether he used information obtained from any observations to support his request that Rosario consent to search the vehicle. Without such findings and any attendant legal conclusions, we cannot assess the propriety of the court's decision on defendants' substantive points regarding the consent search. We therefore remand for the trial court to make factual findings regarding the consequence of Gilmore's entry into the vehicle, his reason for doing so, and whether he used his observations to improperly obtain Rosario's consent to search or if his consent was nevertheless proper based on the totality of facts and circumstances independent of any observations Gilmore may have made when he entered the vehicle.

A-1072-19T3

V.

Finally, defendants argue that the trial court erred by declining to consider their motion for reconsideration. For the following reasons, we conclude the court should substantively address defendants' motion for reconsideration on remand.

As noted, rather than substantively addressing defendants' motion, the court "declined to hear [their] motion for reconsideration" based on its belief that it did not misunderstand the relevant factual circumstances at the time it issued its July 19, 2019 order.[10] Although the court's reasons for refusing to hear defendants' motion appear to address the merits, it nevertheless stated multiple times that it would not hear the motion and that it was "not deciding the merits . . . of [the] motion." The court also did not memorialize its decision

---

[10] We note that under Rule 4:49-2, a court "may reconsider final judgments or orders within twenty days of entry." Lee v. Brown, 232 N.J. 114, 126 (2018). Although Rule 4:49-2 does not expressly apply to criminal practice, courts have nevertheless applied its standards to motions for reconsideration in criminal actions. See State v. Wilson, 442 N.J. Super. 224, 233 n.3 (App. Div. 2015), rev'd on other grounds, 227 N.J. 534 (2017); State v. Puryear, 441 N.J. Super. 280, 294-95 (App. Div. 2015) (applying Rule 4:49-2 and Rule 1:7-4(b) to a trial court's decision to grant reconsideration on its earlier decision on a motion to suppress). Further, the twenty-day time limit for reconsideration of a final judgment does not apply to interlocutory orders, which may be reconsidered at any time prior to final judgment. Lombardi v. Masso, 207 N.J. 517, 534 (2011).

into a written order, indicating that it did not intend to address the substance of the motion.

The certification submitted by defendants in support of their motion, however, functions as "a statement of the matters . . . that counsel believes the court has overlooked or on which it has erred," Rule 1:7-4(b), and neither Rule 1:7-4(b) nor Rule 4:49-2 provide for a court's refusal to consider a motion for reconsideration where it is timely filed. As such, the court erred in failing to consider defendants' motion for reconsideration of its July 19, 2019 order. On remand, the court should address the merits of defendants' argument in support of reconsideration.

Nothing in this opinion should be interpreted as an expression of our view of the results of the remanded proceedings, the scope of which we leave to the trial court's discretion.

Affirmed in part and vacated and remanded in part. We retain jurisdiction. The trial court should complete the remanded proceedings within thirty days of this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION