**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5319-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JUAN D. SANES,
a/k/a PADRO RONDON,

     Defendant-Appellant.

_____

Submitted October 28, 2020 – Decided August 31, 2021

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 14-05-1705.

Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Kevin J. Hein, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed pro se supplemental briefs.

PER CURIAM

A jury convicted Juan Sanes of conspiracy to commit murder and related crimes arising out of a drive-by shooting in Camden. The State alleged Sanes, a triggerman, conspired with two other men to kill Julian Santos, who was dating a former girlfriend of one of the men. Santos was not hit, but the girlfriend was wounded.

Defendant now appeals, asserting error at every stage of the criminal process. Most significantly, he argues the court erred in denying his pre-trial suppression motions; the court erroneously admitted irrelevant and prejudicial evidence; the court erred in denying his motion for acquittal; the trial judge erred by refusing to investigate allegations by a juror that defendant was denied his right to a fair trial; and the court erred in sentencing him.

We affirm.

I.

On May 5, 2013, Diana Ocasio was in a gold Buick near Von Nieda Park in Camden. Her boyfriend Julian Santos was in the front passenger seat; her young daughter was in the back seat; and Ocasio's best friend sat in the other back seat.

A-5319-17

Ocasio noticed a black truck pull up in front of her. Wilber Fernandez ("Wil") — the father of Ocasio's young daughter — and his friend Edward Torres (also known as "Tego"), got out and approached Ocasio's car. One of them held a bat, and the other a gun. As she started to flee, Ocasio heard gunshots — including one from Santos in her car. Fernandez and Torres got back in their vehicle, and, Ocasio, rather than escape to safety, followed them in hers. A witness at the scene generally corroborated this version of events.

As Ocasio followed, Santos exchanged gunshots with someone in the black truck. Witnesses said Fernandez was driving, and Torres was in the passenger seat. Ocasio said she eventually stopped at the intersection of 32nd Street and Pierce, with Fernandez and Torres still ahead of her. At that point, a third man, standing at the corner, began to open fire on her car. She was struck once in her right hand, and she was "grazed" on her head and her left arm. Santos was not shot.

The police investigation soon focused on defendant. After Ocasio went to the hospital, she told police she knew who shot her: his name was "Bam"; Torres and Fernandez were his friends; and he was "[s]hort, dark skin, maybe about five[-]two," and "[a] little chubby." She said she knew Bam for about five or six years and he lived in North Camden. But, when Ocasio was shown a

A-5319-17

photo array that included a photo of defendant taken a year-and-a-half earlier, Ocasio said the person depicted only "look[ed] familiar," and looked like Bam, but was not the shooter. She explained the man in the photo had a beard, and the shooter did not.

Ocasio's failure to identify defendant as the shooter did not deter Sgt. Robert Ferris, the lead investigator. Ferris had previously investigated defendant for narcotics offenses, and knew defendant went by "Bam." Ferris did not search the Camden Police database for any others who went by "Bam."

Two or three blocks away from the shooting, police found Wilber Fernandez's ID card and a black aluminum bat inside a black Dodge Ram. A surveillance video captured part of the incident; it showed a gold or silver-colored Cadillac SUV park on the street, and a man exit the car, stand there very briefly until Ocasio's car approached, and then shoot at Ocasio's car.[1] The video was grainy; and the shooter's face was not visible. But he appeared "[s]hort and stocky," and wore "three-quarter leg shorts," although the colors were unclear.

Around 10:30 p.m. on the day of the shooting, two detectives stopped defendant as he drove a Cadillac matching the one from the surveillance video.

---

[1] Contrary to Ocasio's version of events, no stop sign is visible at the intersection of 32nd Street and Pierce, and Ocasio's vehicle is moving as the man on the sidewalk opened fire.

A-5319-17

He was on Grant Street, not far from the shooting. The police informed him he was "required" to come speak with the police about a shooting earlier that day, and he complied. Defendant was then "detained for questioning." Police immediately towed the Cadillac.

Upon arriving at the police station, defendant was placed in a locked holding cell, and the police took his shoes, belt, and ID. Defendant was wearing blue three-quarter length shorts, with a t-shirt and hooded sweatshirt, and had a shaved head with a thin manicured goatee. Police considered defendant a suspect at this point. Nearly two hours later, Ferris questioned defendant after telling him he was free to go if he wished and after defendant waived his Miranda[2] rights.

Defendant said he had been at his girlfriend's house all day, except for a brief trip by car to Wal-Mart for milk for his daughter. The girlfriend lived just twenty to twenty-five yards from the shooting location. Defendant also acknowledged some people call him "Bam," and he knew Wil Fernandez. After the interview ended, defendant consented to a search of the car and his cell phone. The cell phone search disclosed a contact for "Tego," (Torres's nickname) and multiple calls with "Tego" the day of the shooting. At that point

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-5319-17

in the investigation, Ferris already knew Torres was one of the two men in the black Ram. The police then released defendant.

About a week after the shooting, Ocasio identified the 700 block of North Grant Street in North Camden as a place she had previously seen Bam. Police conducted another photo array, and Ocasio identified Torres as one of the men in the black truck.

One month after the shooting, police conducted a second interview of defendant, after informing him of his Miranda rights. He again insisted he spent the day with his girlfriend. Confronted with surveillance pictures of the Cadillac, defendant said someone who lived nearby owned the same car. Defendant claimed he did not know Fernandez very well. Defendant also stated Torres was his "sister['s] son," but that he did not talk to him very much. He did not remember speaking with Torres on the day of the shooting, stating, "I don't even remember when I talked to him. He do call me sometime, like." He also identified both Fernandez and Torres from pictures.

Defendant admitted the contact "Tego" in his phone was Edward Torres. Ferris asked defendant to explain the calls from Tego on the day of the shooting: 4:18 p.m., thirty-five seconds long; another call lasting one minute, thirty-nine

6

seconds; and a third call at 4:24 p.m., lasting four minutes and sixteen seconds.[3] Defendant said he did not remember speaking with Torres that day; he said it was possible his phone rang while he was sleeping, and his girlfriend picked it up. After completing the interview, Ferris formally arrested and charged defendant.

There were two proceedings before the grand jury. After the first, the grand jury returned an indictment against defendant and Santos. Defendant moved to dismiss the conspiracy-to-commit-murder count in the indictment, contending the State failed to present evidence identifying defendant's co-conspirator. The court denied the motion, finding that phone records showed three calls immediately before and after the shooting occurred between defendant and Torres; defendant "was seen driving a Cadillac resembling the Cadillac owned by his fiance's mother"; and defendant's relationship to Torres, were enough to show that "the grand jury could find that the defendant was in contact with . . . Torres, who was chasing the victims."

About a month later, after Santos pled guilty to aggravated assault and a firearms offense, the State reconvened the grand jury to obtain a superseding indictment against defendant. The State evidently did so to correct

---

[3] The call from dispatch that a shooting had occurred went out at 4:21 p.m.

misstatements Ferris made in the first submission.[4] This time, Ferris accurately testified that Ocasio "described the person who shot her . . . as a short, dark-skinned male that she knew by the name of Bam, not knowing his official name"; Ocasio did not positively identify defendant in the photo array, although she said defendant's picture "looked just like [the shooter]," "[b]ut, from the nose down, that's not him." Ferris also testified Ocasio had provided defense investigators with a statement that "she was sure the shooter is not Juan Sanes who she knows through her ex-boyfriend."

Defendant was charged with multiple crimes, most seriously, first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1) (count one), and first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1) (count two). He was also charged with four counts of second-degree serious-bodily-injury-aggravated-assault (two counts involving Santos and two

---

[4] At the first grand jury proceeding, Ferris, the sole witness, testified that Ocasio "identif[ied] the individual that shot her in the area of 32nd and Pierce Streets as someone she knew as Bam . . . who is friends with her ex-boyfriend," but Ferris incorrectly stated that "Bam [was] identified as Juan Sanes," and that "Ocasio identif[ied] Juan Sanes as the person who possessed a gun who was shooting at her in Camden on May 5th, 2013."

involving Ocasio) N.J.S.A. 2C:12-1(b)(1) (counts three, four, six, and seven)[5]; two counts (one involving Santos and one involving Ocasio) of fourth-degree aggravated assault by pointing a firearm, N.J.S.A. 2C:12-1(b)(4) (counts five and nine); one count of fourth-degree aggravated assault by recklessly causing bodily injury to Ocasio with a deadly weapon, N.J.S.A. 2C:12-1(b)(3) (count eight); third-degree endangering the welfare of a child (Ocasio's daughter), N.J.S.A. 2C:24-4a (count ten); second-degree unlawful possession of weapons, N.J.S.A. 2C:39-5b (count eleven); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a (count twelve); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7b (count thirteen).

The court denied defendant's motions to suppress and to dismiss the indictment, which we discuss below. Trial of the certain persons count was bifurcated from the others. The trial of the main counts spanned more than three weeks. On the second day of deliberations, the jury announced it was "currently deadlocked without a unanimous verdict." With counsel's agreement, the court delivered the model charge on further deliberations. The jury found defendant

---

[5] Counts four and seven quoted N.J.S.A. 2C:12-1(b)(1) and denominated the charged offense a second-degree crime, but it mistakenly referenced N.J.S.A. 2C:12-1(b)(2), a third-degree crime, see N.J.S.A. 2C:12-1(b). Both counts were dismissed before the jury began deliberations.

guilty on all counts, except it failed to reach a verdict on the attempted-murder count, and acquitted defendant of endangering the welfare of a child. The next day, defendant was tried and convicted of the certain persons charge.

After the jury was dismissed, one juror (juror no. 11) wrote to the judge to suggest defendant was denied a fair trial. Juror no. 11 stated that another juror (juror no. 12) had conducted internet research about defendant and had disclosed to juror no. 11 and another juror, after the jury was dismissed, that defendant was "[c]onvicted of raping a 10 year old girl" and "was a convicted drug dealer as well."

Juror no. 11 also alleged that by the third day of deliberations, fellow jurors were "asking me questions, I felt [t]hat I was being interrogated, asking me over and over, putting photos [i]n my face." Juror no. 11 alleged that other jurors told her defendant's guilt was "obvious."

The juror also wrote: "The second thing, every day, out of the 12 jurors, 6 to 8 would spend [t]heir day in the [a]lternates room, they only came in the deliberation [r]oom, if there was a question." She added, "These 6 to 8 people that stayed in the alternates room" questioned her understanding of the case.

The court interviewed juror no. 11 solely about juror no. 12's research, and then interviewed juror no. 12, who said she did the research after the verdict

10

A-5319-17

in the first half of the bifurcated trial, before another juror informed her the proceedings were not over.[6] In response to that disclosure, the State moved to dismiss the certain person conviction, which the court granted.

Before sentencing, the trial court also granted the State's motion to dismiss the attempted murder count on which the jury deadlocked. The court granted the State's application for an extended term, and, after merger, sentenced defendant to fifty years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, on the conspiracy-to-commit-murder count; concurrent with eight years, with forty-two months of parole ineligibility, on the unlawful-possession-of-a-weapon count.

Defendant now appeals. Through counsel he raises the following claims:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS THE SEARCH OF HIS CELL PHONE BECAUSE HIS CONSENT TO SEARCH WAS TAINTED BY HIS UNLAWFUL ARREST.

---

[6] The court initially declined to interview juror no. 12 despite the State's and the defendant's joint request. We granted the State's emergent motion for leave to appeal, summarily reversed the trial court, and directed the trial court to interview juror no. 12 "to determine when Juror No. 12 learned of defendant's criminal record and whether that information was communicated to any other juror before the verdict was reached."

POINT II

THE ADMISSION OF DEFENDANT'S ALLEGED, UNRECORDED ORAL STATEMENT VIOLATED N.J.R.E. 401 AND 403, WHICH PROVIDE FOR THE EXCLUSION OF IRRELEVANT AND UNDULY PREJUDICIAL EVIDENCE.

POINT III

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL ON THE CONSPIRACY TO COMMIT MURDER COUNT AS THERE WAS NO EVIDENCE OF AN AGREEMENT PUT BEFORE THE JURY.

POINT IV

THE TRIAL COURT'S JURY INSTRUCTION ON CONSPIRACY TO COMMIT MURDER FAILED TO INSTRUCT THE JURORS ON THE ELEMENTS OF MURDER.

POINT V

THE TRIAL COURT ERRED WHEN IT FAILED TO FULLY INVESTIGATE JUROR NUMBER 11'S CLAIMS OF JUROR MISCONDUCT.

POINT VI

THE AGGREGATE 50-YEAR EXTENDED-TERM SENTENCE, SUBJECT TO THE NO EARLY RELEASE ACT'S 85-PERCENT PAROLE BAR, SHOULD BE REDUCED BECAUSE IT WAS MANIFESTLY EXCESSIVE AND PROCEDURALLY DEFECTIVE.

In a supplemental pro se brief, defendant also asserts the following arguments:

POINT I

THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1, PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE SUGGESTING AND MISIDENTIFICATION OF DEFENDANT AND BY PROSECUTION MISCONDUCT.

POINT II

TRIAL COURT ERROR IN DENYING DEFENDANT THE RIGHT JURY CHARGE WHEN THE JURY STATED THAT THEY WERE DEADLOCK[ED] AND FOR COERCING THE JURY WITH THE WRONG CHARGE AFTER THE JURY FAILED TO REACH A VERDICT.

POINT III

THE TRIAL COURT ERRED IN DENYING DEFENDANT[']S MOTION TO DISMISS IND[I]CTMENT DUE TO INSUFFICIENT EVID[E]NCE TO SUPPORT A FINDING OF GUILT BEYO[]ND A REASONABLE DOUBT.

POINT IV

THE PROSECUTOR COMMITTED MISCONDUCT DURING SUMMATION BY MAKING PREJUDICIAL COMMENTS THAT DEPRIVED DEF[E]NDANT OF A FAIR TRIAL, AS

13

GUARANTEED BY [THE] UNITED STATES[] SIXTH AND FOURTEE[N]TH AMENDMENTS AND NEW JERSEY CONSTITUTION.

POINT V

DUE TO CUMULATIVE EFFECT OF THE ERRORS COMMITTED BY THE TRIAL COURT IN THIS MATTER, DEFENDANT['}S RIGHTS TO HAVING A FAIR TRIAL, AND DUE PROCESS OF LAW, AS GUARANTEED BY THE UNITED STATES CONSTITUTION AND NEW JERSEY CONSTITU[T]ION.

II.

A.

We first consider defendant's argument that the trial court erred in denying his motion to suppress evidence obtained from the search of his cell phone. Defendant contends he was subjected to an illegal "de facto" arrest unsupported by probable cause, which tainted his consent to search and the fruits of the search. Defendant also contends the State did not present sufficient evidence to justify applying the inevitable discovery doctrine.

We defer to the trial court's fact-findings based on substantial, credible evidence in the record, see State v. Elders, 192 N.J. 224, 243-44 (2007) (describing standard of review of suppression orders), but we exercise de novo review of the legal conclusions the trial court draws from those facts, State v.

14

Smith, 212 N.J. 365, 387 (2012). The trial court credited Ferris's testimony at the suppression hearing, which generally comported with his testimony before the grand jury. The court concluded that the police performed an investigative detention supported by reasonable and articulable suspicion that defendant was involved in the shooting, and the detention did not transform into a "de facto arrest." Nonetheless, the trial judge also found that "the officers had probable cause to believe the defendant was engaged in criminal activity."

We affirm the trial court's order denying defendant's suppression motion, but we do so for different reasons. See State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) (recognizing that "[w]e are free to affirm the trial court's decision on grounds different from those relied upon by the trial court"). Unlike the trial court, we are convinced that defendant was under arrest when he gave consent to search his phone. But because the arrest was supported by probable cause, and the consent voluntarily and knowingly given, the cell phone search did not violate defendant's rights.

In State v. Dickey, 152 N.J. 468, 479 (1998), the Court stated that "the duration of the detention and the degree of intrusion upon the liberty of the motorists exceeded" that of an authorized investigatory stop. "Simply stated, an investigative stop becomes a de facto arrest when 'the officers' conduct is more

intrusive than necessary for an investigative stop.'" Id. at 478 (quoting United States v. Jones, 759 F.2d 633, 636 (8th Cir. 1985)). Relevant factors include: the duration of the stop, if it involves unnecessary delay; "the degree of fear and humiliation that the police conduct engenders"; "transporting a suspect to another location or isolating him from others"; "subjecting a suspect to unnecessary delays, handcuffing him, or confining him in a police car." Id. at 479 (quoting United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994)).

Applying those factors, we are convinced defendant was under de facto arrest. At the suppression hearing, Ferris described how police took defendant into custody and obtained his consent to search the phone. Although defendant allegedly agreed to go down to the stationhouse for questioning, police placed him in handcuffs for the ride.[7] After confiscating his shoes and belt, police then held him for two hours in a locked holding cell before being interviewed. And his car was impounded. And Ferris did not let defendant leave when the interview was over; instead, he released him only after completing a warrant check on him. The duration of defendant's detention, the restraints applied, his

_____

[7] Although Ferris stated defendant "agreed" to come to the station, an officer on the scene testified at trial he informed defendant that he was "required" to come in for an interview.

16

transportation to another location, and the way he was held for two hours converted the stop into a de facto arrest.

But we are satisfied defendant's arrest was supported by the requisite probable cause. See State v. Coles, 218 N.J. 322, 346 (2014) (stating that when a "de facto arrest occurs, the particularized suspicion that originally supported the investigative detention is no longer sufficient and the arrest must be supported by probable cause"). Police have probable cause when they have "a well-grounded suspicion that a crime has been . . . committed." State v. Nishina, 175 N.J. 502, 515 (2003) (quoting State v. Sullivan, 169 N.J. 204, 211 (2001)). Here, "the facts and circumstances within . . . [Ferris's] knowledge and of which [he] had reasonably trustworthy information [were] sufficient . . . to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." Schneider v. Simonini, 163 N.J. 336, 361 (2000) (internal quotation marks omitted) (quoting Brinegar v. United States, 338 U.S. 160, 175-76 (1949)).

When the police came upon defendant in his car, probable cause to arrest was supported by the following facts: within a few hours of the shooting and in the vicinity of the shooting, defendant was driving a similar vehicle to the one the shooter used in the surveillance footage; defendant wore three-quarter length

pants, like the shooter; he generally matched the physical attributes of the shooter; and he was known to use the name "Bam," which the victim used to name the shooter. The totality of this information provided law enforcement with probable cause to arrest defendant and question him at the police station.

Therefore, defendant's consent to search his cell phone was not tainted by an illegal arrest, and the trial court correctly denied defendant's motion to suppress his cell phone and subsequent fruits of that search. Having reached this conclusion, we need not reach the issue of inevitable discovery.

B.

Ferris testified that as defendant traveled to the stationhouse after his second interview a month after the shooting, defendant asked Ferris "if . . . Wilber Fernandez and Edward Torres came forward, admitted what they did, and took responsibility [would we] drop[] . . . [the] charges [against defendant]?" Defendant unsuccessfully moved pre-trial to suppress the statement. The motion judge found the statement was unprompted and therefore did not violate defendant's <u>Miranda</u> rights. The judge reserved on the statement's relevance. When Ferris recounted the statement at trial, with a different judge presiding, defense counsel did not object. Nonetheless, defendant contends on appeal the statement was not relevant, it was unduly

18

prejudicial, and the trial court's mistaken admission of the statement denied him a fair trial. We disagree.

We acknowledge that defendant's statement was subject to N.J.R.E. 403 — which authorizes a court to exclude relevant evidence whose "probative value is substantially outweighed by the risk of . . . undue prejudice" — although the statement satisfied the party-opponent exception to the hearsay rule, N.J.R.E. 803 (b)(1). See State v. Vargas, 463 N.J. Super. 598, 610 (App. Div. 2020) (stating that "admissible hearsay must avoid the exclusions found in Article IV of our Rules of Evidence"). And, by failing to object, defense counsel did not prompt the trial court to expressly address the statement's relevance, and balance that against any prejudice. Therefore, we shall decide the issue de novo. Hassan v. Williams, 467 N.J. Super. 190, 214 (App. Div. 2021) (applying N.J.R.E. 403 analysis de novo where trial court did not address the issue).

We conclude that defendant's statement was relevant — that is, it had "a tendency in reason to prove or disprove any fact of consequence to the determination of the action," N.J.R.E. 401, and its probative value was not "substantially outweighed by the risk of . . . [u]ndue prejudice," N.J.R.E. 403. Defendant's statement tended to show defendant had a strong enough relationship with Fernandez and Torres that he contemplated getting them to

admit their involvement in the crimes. A jury could also infer a consciousness of guilt because defendant was inquiring about ways to avoid the charges, rather than proclaiming his innocence.

The statements were not unduly prejudicial. Indeed, during his custodial interview, defendant repeatedly offered to speak to Fernandez and Torres, and the recorded interview was played in full in front of the jury without objection. Defendant said, "I know them two guys," and offered to assist in getting them to speak to the police again. In short, the admission of the unprompted statement was not error.

C.

We also reject defendant's argument that the trial court erred in denying his Rule 3:18-1 motion to acquit on the conspiracy count. Defendant contends there was insufficient evidence of an agreement. We disagree.

We review the trial court's decision de novo, and "determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014). Applying that standard, defendant was not entitled to acquittal.

20

On the conspiracy-to-commit-murder count, the verdict sheet asked the jury whether defendant "with the purpose of promoting or facilitating" the commission of murder "(1) [a]gree[d] with another person or persons that they or one or more of them would engage in conduct which constitutes such crime; or (2) [a]gree[d] to aid another person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime." See also N.J.S.A. 2C:5-2.

The State was not required to produce direct evidence that defendant agreed with Fernandez and Torres to shoot Santos. "[A] conspiracy is rarely capable of proof through direct evidence"; instead, the conspiracy "is most frequently established by inferences drawn from proof of overt acts done in pursuance of it . . . and the circumstantial evidence is often 'more certain, satisfying and persuasive than direct evidence.'" State v. Graziani, 60 N.J. Super. 1, 13 (App. Div. 1959) (quoting State v. Goodman, 9 N.J. 569, 581 (1952)), aff'd o.b., 31 N.J. 538 (1960). "When 'each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the evidence as a whole,' judgment of acquittal is not warranted." State v. Samuels, 189 N.J. 236, 246 (2007) (alteration in original) (quoting United States v. Brodie, 403 F.3d 123, 158 (3d

Cir. 2005)); see also State v. Stull, 403 N.J. Super. 501, 506 (App. Div. 2008) (noting that "[w]hen there is no direct testimony, the fact-finder may rely solely on inferences available from the proofs").

The State provided evidence of six phone calls between defendant and Torres immediately before and immediately after the time of the shooting. This evidence gave critical context, and allowed the jury to make the required inferences with respect to the surveillance footage. Evidence of the calls also permitted inferences that: defendant and Torres spoke as Ocasio followed the black truck; defendant left his girlfriend's home and rushed to the location where the black truck would be driven; and defendant fired into Ocasio's car like the individuals in the black truck in which Torres was located had done. Although the assailant's face is not identifiable from the video, an individual driving the same car left defendant's girlfriend's apartment complex (where he said he spent the day) shortly before the shooting. His clothes and physical appearance matched those the victim identified. Those facts allowed the jury to infer that defendant conspired with Torres to commit murder.

D.

We turn next to defendant's contention that the court should have questioned juror no. 11 about the other jurors' interactions with her during

22

deliberations. Defendant contends that juror no. 11's letter suggested she was inappropriately pressured into reaching a verdict.

Defendant's argument lacks merit. "Calling back a jury for questioning following discharge is an 'extraordinary procedure,' to be utilized 'only upon a strong showing that a litigant may have been harmed by jury misconduct.'" Davis v. Husain, 220 N.J. 270, 279 (2014) (quoting State v. Athorn, 46 N.J. 247, 250 (1966)); see also R. 1:16-1 ("Except by leave of court granted on good cause shown, no attorney or party shall directly, or through any investigator or other person acting for the attorney, interview, examine, or question any grand or petit juror with respect to any matter relating to the case."). "[J]ury secrecy is essential to protect the deliberative process itself." State v. Griffin, 449 N.J. Super. 13, 20 (App. Div. 2017).

Juror no. 11's letter demonstrated, at most, a vigorous and heated debate. But, "[i]t is to be expected that in the interplay of personalities attending a jury's deliberations there will be occasions when some jurors will give vent to feelings of exasperation or frustration." Athorn, 46 N.J. at 253. The Supreme Court in Athorn reversed the trial court's order to interview jurors post-verdict in part because "there [was] nothing in [the complaining juror's] testimony indicating

that he voted for a guilty verdict because his will was overborne by the improper actions of other jurors." Ibid.

Juror no. 11's letter fell short of demonstrating misconduct by her fellow jurors relating to how she viewed the evidence; and it fell short of demonstrating that juror no. 11's will was overborne. Juror no. 11 referred only to the deliberations on count 1, attempted murder. And, as to that count, the jury failed to reach a verdict, suggesting that juror no. 11 was undeterred; as she wrote in her letter, she "refused to vote [g]uilty [o]n count one." In sum, there were insufficient grounds to inquire if the other jurors improperly pressured juror no. 11.[8]

_____

[8] Although we hesitate to raise an issue the parties did not address, see State v. Arthur, 184 N.J. 307, 327 (2005), we express our concern about juror no. 11's allegation that (1) part of the jury deliberated while six to eight jurors absented themselves; and (2) those six to eight jurors congregated with the alternates.

The mere presence of deliberating jurors with the alternates during deliberations violates R. 1:8-2(d)(1), which states that once alternates are selected and the court decides not to dismiss them, "the alternate jurors shall be sequestered apart from the other jurors and shall be subject to the same orders and instructions of the court, with respect to sequestration and other matters, as the other jurors." In its final charge to the jury, the trial judge instructed that the alternates would "be essentially kept in a different location" from the deliberating jurors, and the alternates were "not to discuss the deliberations that take place with your fellow jurors." And, the alternates were told the deliberating jurors "can't talk about [the case] with [them]." No inquiry was requested or made as to whether the alternates and part of the jury congregated

E.

Defendant's remaining points in his counseled brief, and all the points raised in his pro se brief, challenging his convictions, lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

---

together as alleged, and whether the alternates deliberated with the deliberating jurors. See Manning v. Huffman, 269 F.3d 720, 725 (6th Cir. 2001) (noting that "several state and federal courts have held that [a] defendant may establish prejudice simply by showing that alternates actually participated in jury deliberations"); United States v. Ottersburg, 76 F.3d 137 (7th Cir. 1996) (reversing conviction after two alternates were permitted to deliberate and sign verdict form).

Nor was an inquiry requested or made regarding whether, as alleged, roughly half the jury deliberated while the other half absented itself, despite the judge's instruction that the jury "should only discuss and deliberate on this case when all jurors are together in the jury deliberation room." See Model Jury Charges (Criminal), "Recess Instructions During Jury Deliberations" (approved June 10, 2013) (stating that the deliberating jury "should only discuss and deliberate on the case when all the jurors are together in the jury deliberation room)." The constitutional guarantee of a jury trial requires a unanimous decision reached by "jurors . . . who have deliberated together." State v. Lipsky, 164 N.J. Super. 39, 45 (App. Div. 1978). Indeed, a jury is required to begin deliberations anew when an alternate is substituted to assure that the jury deliberates together toward a unanimous verdict. See State v. Trent, 79 N.J. 251, 257 (1979) (finding plain error requiring new trial where court instructed jury to continue with its deliberations after alternate was seated after deliberations had begun).

In any event, defendant does not argue his conviction should be reversed based on juror no. 11's statements concerning alleged discussions with the alternate jurors or deliberations with less than the final twelve jurors. We therefore do not decide or offer any opinion on those issues.

III.

We turn to defendant's sentence. Defendant first contends the trial court erred in granting the State's motion to impose an extended term. Specifically, defendant asserts one of the predicate offenses did not meet the statutory criteria for imposing the extended term. Defendant also contends the trial court failed to consider that the sentence was essentially a life sentence. We address these points in turn, mindful of our obligation to withhold substituting our judgment for the sentencing court's, State v. Case, 220 N.J. 49, 65 (2014), and to disturb a sentence only if "(1) the trial court failed to follow the sentencing guidelines, (2) the aggravating and mitigating factors found by the trial court are not supported by the record, or (3) application of the guidelines renders a specific sentence clearly unreasonable," State v. Carey, 168 N.J. 413, 430 (2001).

The trial court granted the State's application to sentence defendant to a discretionary extended term as a "persistent offender." N.J.S.A. 2C:44-3(a). To satisfy the "persistent offender" standard, the defendant must be "a person who at the time of the commission of the crime is 21 years of age or over,"; second, the defendant must be one

> who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least 18 years of age, if the latest in time of these crimes or the date of the

26

defendant's last release from confinement, whichever is later, is within 10 years of the date of the crime for which the defendant is being sentenced.

[Ibid.]

There is no dispute the first requirement was met; defendant was thirty-nine on the date of the shooting. Although defendant's criminal record included convictions of multiple serious offenses — including terroristic threats and endangering the welfare of a child committed in 1997 and four drug offenses committed in 2007 — the State sought an extended term based on: 1) defendant's April 2, 2003 commission of fourth-degree simulating a motor vehicle driver's license that led to a sentence of one year of probation, and 2) his June 6, 2006 commission of fourth-degree violation of community supervision for life (CSL), for which defendant was sentenced to 45 days in jail. Defendant contends both predicate crimes must fit within the statute's ten-year window, and the simulating a driver's license offense resulted in probation, not a custodial sentence.

Defendant misconstrues the statute. Only the "latest in time" of the predicate crimes must fall within ten years of the date of the crime for which a defendant is sentenced — in this case, the conspiracy to commit murder on May 5, 2013. Here, the "latest in time" of the two crimes was the fourth-degree

A-5319-17

violation of community supervision for life, N.J.S.A. 2C:43-6.4(d) (2006). The indictment charged that defendant committed that crime on June 6, 2006, well within the ten-year period beginning May 5, 2003.

Defendant also contends the aggravating factors the court found did not justify an aggregate fifty-year term. The court found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) ("risk . . . defendant will commit another offense"), noting defendant committed these crimes while on parole, which added more weight to the factor. The court also noted that despite defendant's prior contacts with the criminal justice system, he conspired with Torres and repeatedly shot a firearm in the direction of a vehicle that three adults and a child occupied.[9] The court also found aggravating factor six, N.J.S.A. 2C:44-1(a)(6) ("extent of . . . defendant's prior criminal record and the seriousness of the offenses of which [he] has been convicted"), observing defendant had six adult indictable offenses, not including the offenses relied upon to determine extended term eligibility, and multiple terms of incarceration. The court again noted the risk defendant posed to public safety by discharging a weapon. Finally, the court found

---

[9] Relying on defendant's aggravated assault and firearms convictions, the judge rejected defense counsel's argument that the failure to convict on the attempted murder charge precluded the court from finding that defendant discharged a firearm toward the vehicle's occupants.

aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (need to deter "defendant and others from violating the law").  The court found the need to deter defendant and others "who believe that there are [no] consequences for what they do."

Applying our deferential standard of review, Case, 220 N.J. at 65, we discern no basis to disturb the court's weighing of the aggravating factors, or its imposition of sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION